

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

_____

Nos. 07-12-0481-CV, 07-12-0482-CV
_____

IN THE INTEREST OF N.K., A CHILD
IN THE INTEREST OF A.M., A CHILD

_____

On Appeal from the 108th District Court
Potter County, Texas
Trial Court Nos. 78,949-E, 80,536-E, Honorable Douglas Woodburn, Presiding

_____

March 25, 2013

## OPINION

Before Quinn, C.J., and Hancock and Pirtle, JJ.

Appellant, Bethany, appeals the trial court's order terminating her parental rights to her two daughters, N.K. and A.M.[1]  On appeal, Bethany contends the evidence is insufficient to support the trial court's order of termination.  We will affirm.

---

[1] Throughout this opinion, appellant will be referred to as "Bethany," and the children will be identified by their initials.  See TEX. FAM. CODE ANN. § 109.002(d) (West Supp. 2012); TEX. R. APP. P. 9.8(b).  The trial court also terminated the parental rights of both fathers involved.  Neither father has appealed the trial court's order of termination.

Factual and Procedural History

Bethany is mother to N.K., five years old at the time of trial, and A.M., one year old at the time of trial. Bethany lived in a home with her husband Michael, father to A.M. and stepfather to N.K. Also living in the home was a friend of the family, Ashley. The record reveals the following evidence relating to the investigation and culminating in the termination of Bethany's parental rights.

Initial Investigation

The Department first became involved with the family in August 2010, when it began its investigation upon a report of physical abuse and unsanitary living conditions in the home. Bethany denied that any physical abuse had occurred but agreed to and did clean up the home. During the investigation, caseworker Charles McArthur learned of a new report; this one, he described generally, related to concerns of sexual assault of N.K. During this same investigation, McArthur also discovered a Craigslist ad for babysitting services and for services of a sexual nature, both of which contained Bethany's contact information. Additionally, both Bethany and Michael had taken out ads on another website offering sexual services in exchange for money.

Nonetheless, the forensic interview of N.K., as best as could be performed considering her tender age, yielded no outcry of sexual abuse, and the SANE exam yielded no finding of trauma which would suggest sexual assault. Ultimately, the Department concluded that there was insufficient evidence to continue its case at that time, and the case was closed.

<u>The Second CPS Investigation and the Prostitution Investigation</u>

A year had not passed before the Department again intervened, this time in March 2011, when McArthur learned that law enforcement officers had gone to Bethany and Michael's home in furtherance of an investigation into suspected prostitution at the premises. McArthur learned that Bethany and Michael were going to be arrested. In fact, it did come to pass that Bethany, Michael, and roommate Ashley were arrested. N.K. and A.M. were removed and placed in foster care.

Department investigator, Jona Roland, responded to the house the evening of the arrests. She testified that N.K. was dirty, exhibited scratches on her face, and was not appropriately dressed for the cold weather. Roland also observed that the house was "[n]ot a good environment for children"; it was dirty with clothes and food everywhere. Roland interviewed Michael in jail during which conversation Michael admitted to having participated in the prostitution services with Ashley and Bethany. Bethany, on the other hand, denied that prostitution had occurred and described the services offered and rendered as "all a massage-type thing."

However, in an interview with Michael Nelson, an investigator for the Potter County District Attorney's office, Bethany essentially admitted to engaging in prostitution from the home. She explained that, before any of her clients would arrive at the house, Michael would take the children away and go to a park, a mall, or a restaurant. Bethany fully admitted to Detective Jeff Higley of the Amarillo Police Department that she and Ashley put their names on Craigslist for "prostitution purposes."

Victor Martinez, another investigator for the Potter County District Attorney's Office, conducted surveillance and undercover work on Michael and Bethany's home. He testified that he observed, "[s]everal different males coming and leaving the residence." These men would arrive at the house, stay for about ten to fifteen minutes, and then leave. He observed that Michael, Bethany, or Ashley would sometimes leave the home with the children before the men would show up. He could not confirm whether the children were ever present in the home when any of the men were there. Michael did testify, however, that the children were never present in the home when a client arrived.

Bethany's History of Criminal Conduct, Domestic Violence, and Drug Abuse

Bethany pleaded guilty to prostitution and was placed on probation. At the time of her prostitution conviction, she also remained on probation for a 2006 drug-related conviction. The record also reveals a history of domestic violence between Bethany and N.K.'s biological father, Richard. Additionally, in an attempt to demonstrate to the trial court how protective Bethany is of her children, Michael cited an instance in which Bethany once "choked [him] half to death" after she learned that he inadvertently sent a text message to an underage female.

Clinical psychologist, William Hoke, Ph.D., who was requested by the Department to evaluate Bethany and Michael, testified that Bethany "reported a pretty significant" history of drug abuse and had "many years of methamphetamine abuse." He expressed his opinion that she remains chemically dependent and needs to be in a drug recovery program for the remainder of her life.

Michael's History, Admission of Inappropriate Sexual Contact with N.K.

In a July 2012 interview with Detective Higley, Michael confessed that, on one occasion, "when [N.K.] was about three years old, that he was at home alone with her. And he had taken her into the bedroom and placed her hand on his penis and began to rub her hand on his penis over his clothes." Shortly after his confession, Michael unsuccessfully attempted suicide by drug overdose. He later recanted his confession of sexual abuse of N.K., maintaining that he only confessed to inappropriate touching in an effort to assist Bethany in getting the children back. He testified that he made the confession based on his understanding of a statement from Bethany's therapist that it would be easier for Bethany to get the children back if someone were to confess to "doing something" to N.K. He denied ever sexually abusing either of the girls.

Michael, like Bethany, reported to Hoke a "pretty significant drug history." He admitted to having worked as a prostitute when he lived in California and also testified to his history as a victim of sexual abuse, his history of drug abuse, and his criminal record, including sexually-oriented offenses. Hoke reported that Michael had been incarcerated approximately fifty times.

Gerald Rogers, who performed a full psychological assessment of Michael at the Department's request and who also participated in individual counseling with him, testified that Michael had not made the progress necessary for reunification with A.M. Rogers characterized Michael as "such a high-risk individual[] that [Rogers] could never recommend reintegration at this point." Rogers added that the children would be at high risk if returned to a home in which Michael resided and based his assessment on a

5

number of considerations:

> Well, there's a number of factors that correlate with re-offending or recidivism. One[] is [does he] have an extensive criminal history, which he does. Another is to have had one or more victims, which he has had. Another would be that he's been involved in a lot of boundary issues where there's sexual acting out and sexual behaviors. And he's been involved in another case involving his wife of promoting prostitution for her.

Bethany's Testimony Regarding Michael

At trial, Bethany maintained that she never saw Michael act inappropriately with the children. In the context of inappropriate contact, Bethany testified that she had no concerns related to Michael's history with sexual abuse; nor did she express any "great concerns" that had arisen during their marriage. She went on to characterize Michael as a good father with a strong relationship with the girls. Bethany testified that she and Michael had no contact but did remain married at the time of trial. She admitted that she had made some inquiries into possible couple's reunification therapy.

Removal of the Children, N.K.'s Behavioral Needs and Current Placement

At the time of the removal, the Department investigated placement of the sisters with family members but were unable to approve either of the two proposed placements for a variety of reasons dealing generally with those parties' involvement in either other Department proceedings or criminal matters. Both girls were placed in foster care.

The record demonstrates that N.K. suffered from considerable psychological and emotional disturbances prior to and at the time of trial. Charles Lyles is a licensed professional counselor who worked with N.K. for fifteen sessions from August 2010 to May 2011. He testified that N.K., who was three years old when Lyles began working

with her, would exhibit extreme tantrums in which she would throw things and growl. Lyles explained that N.K.'s behavior worsened during her therapy sessions with him and she began to demonstrate emotional disregulation, the inability to regulate her feelings or emotions. Lyles diagnosed N.K. with adjustment disorder with disturbance of emotions and conduct and reported that N.K. did not make progress during therapy.

Lynn Jennings also provided therapy for N.K. and received reports that N.K. had been exhibiting "sexual acting out behavior." Jennings reported that N.K. consistently attempted to touch other people on their chest area and explained to Jennings that "Mommy and Daddy said it was okay to touch [Ms. Jennings's] chest." Jennings diagnosed N.K. with adjustment disorder with disturbance of conduct and mood. Jennings explained that N.K. was moved from her first foster home due to sexualized behavior and moved from her second foster home due to defiant behavior. N.K. was eventually placed in the Children's Home of Lubbock, a residential treatment center and a placement which Jennings considered appropriate in light of N.K.'s behavioral needs at the time.

Lyles's and Jennings's observations were consistent with those of Danny Pectol, a program director at the Children's Home at Lubbock, where N.K. resided at the time of trial. He testified that N.K. had made progress at the home but explained that, upon her arrival, she was a deeply troubled child who suffered from severe night terrors and whose needs were so acute that they required extra training and extra staffing in order to meet them. When N.K. arrived at the home, she was extremely aggressive and wild; she bit, hit, scratched, and kicked the staff and other children at the home. She, too, would attempt to harm herself by hitting her head against the floor or the wall. When

7

she started attending school, her aggressive behavior continued, resulting in several suspensions for attacking other children, cursing, and screaming. Pectol testified that N.K. had been diagnosed with post-traumatic stress disorder (PTSD).

Pectol described N.K.'s night terrors, episodes during which she would thrash about and scream. He testified that the staff had to be specially trained to recognize that her night terrors were a PTSD reaction in which she felt she had to defend herself; they were trained to refrain from physical contact with her during these terrors unless she was engaging in self-harm and to continuously reassure her verbally that she was safe. Pectol also testified that, although N.K. has not made an outcry of sexual abuse, she exhibited "almost all [the] red flags" as having been a victim of sexual abuse, referring to her night terrors, hypervigilance, sexualized behaviors, extreme aggression, and tendency to wet and soil herself. He explained, too, that the absence of an outcry of sexual abuse would not be abnormal considering N.K's age.

Pectol testified that N.K. needs to be in a placement with people who are specifically trained to work with the child's needs and have received "real specific trauma based and sexually based trainings to make sure that they had down what they need for [N.K.]." Pectol explained that, despite her intensive needs, the home remained committed to helping N.K. and providing her the stability she needs.

Termination Proceedings

Following the presentation of this evidence in a trial to the bench, the trial court found by clear and convincing evidence that Bethany (1) knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered their

physical or emotional well-being, (2) engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered their physical or emotional well-being, and (3) failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of the children who had been in the permanent or temporary managing conservatorship of the Department for not less than nine months as a result of their removal from the parent under Chapter 262 for abuse or neglect.  See TEX. FAM. CODE ANN. § 161.001(1)(D), (E), (O) (West Supp. 2012).  The trial court further found that termination of Bethany's parent-child relationships with N.K. and A.M. was in the children's best interest.  See id. § 161.001(2).  Bethany appeals the trial court's order, challenging the sufficiency of the evidence to support it.

Standards of Review

The natural right existing between parents and their children is of constitutional dimensions.  Holick v. Smith, 685 S.W.2d 18, 20 (Tex. 1985); see Santosky v. Kramer, 455 U.S. 745, 758–59, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982).  A decree terminating this natural right is complete, final, irrevocable, and divests for all time that natural right as well as all legal rights, privileges, duties, and powers between the parent and child except for the child's right to inherit.  Holick, 685 S.W.2d at 20.  That being so, we are required to strictly scrutinize termination proceedings.  In re G.M., 596 S.W.2d 846, 846 (Tex. 1980).  However, parental rights are not absolute, and the emotional and physical interests of a child must not be sacrificed merely to preserve those rights.  In re C.H., 89 S.W.3d 17, 26 (Tex. 2002).

9

The Texas Family Code permits a court to terminate the parent-child relationship if the petitioner establishes (1) one or more of the enumerated acts or omissions and (2) that termination of the parent-child relationship is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001. Though evidence may be relevant to both elements, each element must be proved, and proof of one does not relieve the burden of proving the other. See In re C.H., 89 S.W.3d at 28. While both a statutory ground and best interest of the child must be proved, only one statutory ground is required to terminate parental rights under section 161.001. In re A.V., 113 S.W.3d 355, 362 (Tex. 2003). Therefore, we will affirm the trial court's order of termination if legally and factually sufficient evidence supports any one of the grounds found in the termination order, provided the record shows also that it was in the best interest of the child for the parent's rights to be terminated. See id.

Due process requires the application of the clear and convincing standard of proof in cases involving involuntary termination of parental rights. In re J.F.C., 96 S.W.3d 256, 263 (Tex. 2002); see TEX. FAM. CODE ANN. § 161.206(a) (West 2008). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2008). This standard, which focuses on whether a reasonable jury could form a firm belief or conviction, retains the deference a reviewing court must have for the factfinder's role. In re C.H., 89 S.W.3d at 26. We must maintain appropriate deference to the trial court's role as fact-finder by assuming that it resolved evidentiary conflicts in favor of its finding

when reasonable to do so and by disregarding evidence that it reasonably could have disbelieved. See In re J.F.C., 96 S.W.3d at 266–67.

In reviewing the legal sufficiency of the evidence supporting an order terminating parental rights, we look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction as to the truth of the allegations sought to be established. See id. at 266. "To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so." Id. In other words, we will disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. Id.

When reviewing the factual sufficiency of the evidence supporting a termination order, we determine "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the [Department]'s allegations." In re C.H., 89 S.W.3d at 25. In conducting this review, we consider whether the disputed evidence is such that a reasonable factfinder could not have resolved the disputed evidence in favor of its finding. In re J.F.C., 96 S.W.3d at 266. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." Id.

11

Applicable Law and Analysis

Predicate Acts or Omissions

Bethany contends that the evidence is legally and factually insufficient to support a finding of a predicate act or omission that would serve as grounds for terminating her parental rights to her children. The Department responds by citing evidence that Bethany engaged in prostitution in the family home, failed to maintain a home suitable for children, disregarded potential for harm by leaving the children in Michael's care, has an extensive history of methamphetamine abuse, attacked and choked Michael when he sent a text message to a girl, and generally made poor decisions throughout the pendency of this case which are indicative of her failure to make the necessary changes to regain custody of the children. The Department characterizes such evidence as sufficient to establish that Bethany (1) knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered their physical or emotional well-being and (2) engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered their physical or emotional well-being. See TEX. FAM. CODE ANN. § 161.001(1)(D), (E).

Evidence concerning subsections (D)'s and (E)'s statutory grounds for termination is interrelated; therefore, we will consolidate our review of the evidence supporting these grounds.[2] See In re I.G., 383 S.W.3d 763, 770 n.6 (Tex.App.—

---

[2] Indeed, this Court has observed the interrelated nature of evidence that could support these two statutory grounds for termination: "Although the focus of subsection (D) is on the child's living environment and not on the parent's conduct, parental conduct may produce an endangering 'environment.'" In re D.R.J., No. 07-08-00410-CV, 2009 Tex.

12

Amarillo 2012, no pet.). Endangerment of the children's physical or emotional well-being is an element of both subsections (D) and (E). See TEX. FAM. CODE ANN. § 161.001(1)(D), (E). "[E]ndanger" means "to expose to loss or injury; to jeopardize." Tex. Dep't of Human Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex. 1987). Although "'endanger' means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that the child actually suffers injury." Id.; see In re P.E.W., 105 S.W.3d 771, 777 (Tex.App.—Amarillo 2003, no pet.) (observing that child "need not develop or succumb to a malady" in order to prove endangering conditions).

The Texas Supreme Court has reiterated that endangering conduct is not limited to actions directed toward the child: "It necessarily follows that the endangering conduct may include the parent's actions before the child's birth, while the parent had custody of older children, including evidence of drug usage." In re J.O.A., 283 S.W.3d 336, 345 (Tex. 2009); see In re T.N., 180 S.W.3d 376, 383 (Tex.App.—Amarillo 2005, no pet.). A parent's conduct in the home, such as illegal drug use or unlawful conduct, can create an environment that endangers the child's physical and emotional well-being. See In re J.T.G., 121 S.W.3d 117, 125 (Tex.App.—Fort Worth 2003, no pet.); see also In re W.S., 899 S.W.2d 772, 776 (Tex.App.—Fort Worth 1995, no writ) (concluding that subsection (D)'s "conditions or surroundings" includes both acceptability of living conditions and parent's conduct in home). Indeed, "[i]t is illogical to reason that inappropriate, debauching, unlawful, or unnatural conduct of persons who live in the home of a child, or with whom a child is compelled to associate on a regular basis in his home, are not

App. LEXIS 5231, at *7 (Tex.App.—Amarillo July 8, 2009, pet. denied) (mem. op.) (citing In re D.T., 34 S.W.3d 625, 633 (Tex.App.—Fort Worth 2000, pet. denied)).

inherently a part of the conditions and surroundings[] of that place or home." In re D.R.J., 2009 Tex. App. LEXIS 5231, at *7 n.5 (quoting In re B.R., 822 S.W.2d 103, 106 (Tex.App.—Tyler 1991, writ denied)).

In our review, we look not only at evidence regarding the parent's active conduct, but also evidence showing the parent's omissions or failures to act. In re A.B., 125 S.W.3d 769, 777 (Tex. App.—Texarkana 2003, pet. denied). Subsection (D) permits termination based on a single act or omission by the parent. See id. at 776. A parent's continuation of illegal drug use or other criminal activity, despite knowledge that parental rights are in jeopardy, may also serve as evidence of "voluntary, deliberate, and conscious conduct" that supports a finding of endangerment under section 161.001(1)(E). See Robinson v. Tex. Dep't of Protective & Regulatory Servs., 89 S.W.3d 679, 686–87 (Tex.App.—Houston [1st Dist.] 2002, no pet.).

With these principles in mind, we turn to the record before us and, perhaps, the most obvious development outlined by the evidence: the group's prostitution activities conducted from the family home. The record seems to support the conclusion that the group did make efforts to take the children—N.K., A.M., and Ashley's child—from the home before a client would arrive such that the children were not present whenever the client was. Nonetheless, the dangers associated with having strangers come to the family home to engage in sexual activity in exchange for money are obvious, as Rogers recognized: "Well, if you start bringing Johns in or customers for prostitution into your home, they know where you live and they may return. And it was very poor judgment." Without question, the fact that Bethany, Michael, and Ashley operated a prostitution service from the family home had an impact on the children's conditions or

surroundings, and risks associated with this criminal activity represent a risk to the children's physical and emotional well-being. Cf. In re M.R., 243 S.W.3d 807, 819 (Tex.App.—Fort Worth 2007, no pet.) (discussing impact of "continued criminality" as it relates to endangerment of child's well-being). We reiterate that it is not necessary that the conduct in question be directed at the children or that the children actually suffer injury as a direct result of the conduct. See Boyd, 727 S.W.2d at 533.

Aside from the risk directly associated with operating a prostitution service from the home where the girls lived, Bethany testified that the prostitution operation took an emotional and physical toll on her and her ability to act in a motherly capacity:

> I started to say that I feel that some of [N.K.'s] behaviors could be the fact that I was not emotionally there for her when I was prostituting. And when she was – that was at the same time she was going through the change of going – having to go to Richard's house and coming back to mine. And I did neglect her emotional needs by not fully being there when she was going through that change and fully being there as a mother at that time.

And, while we certainly agree that it was preferable for the children to be taken away from the home during any transactions relating to the group's prostitution endeavors, we do note that doing so meant that the children were forced to leave their home at whatever hour and for however long the client's appointment would dictate. Conduct which subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child. In re S.D., 980 S.W.2d 758, 763 (Tex.App.—San Antonio 1998, pet. denied).

Further, we observe that "[a]n environment which routinely subjects a child to the probability that she will be left alone because her parents are once again jailed, whether because of the continued violation of probationary conditions or because of a new

offense growing out of a continued use of illegal drugs, or because the parents are once again committed to a rehabilitation program, endangers both the physical and emotional well-being of a child." Id. Here, Bethany engaged in the prostitution activities from the home despite the fact that she was on probation and despite the fact that the Department had recently concluded its first investigation; Bethany's parental rights were in jeopardy, and she nonetheless engaged in activity which increased the likelihood that she would be separated from the children, either because she was incarcerated or because the Department had removed the children. Cf. id. All that being said, the record establishes the group's at-home prostitution operation directly and indirectly endangered the children's physical and emotional well-being.

With respect to Michael's confession of sexual abuse of N.K., it would not appear from the record that Bethany was aware of the alleged abuse.[3] Her reaction to having heard that Michael confessed to having inappropriately touched N.K., however, is rather telling. Kaye Renshaw, Bethany's therapist, testified that when she first confronted Bethany with Michael's confession of sexual abuse of N.K., Bethany responded by maintaining that Michael never had the opportunity to do such a thing. According to Renshaw, Bethany did not take responsibility for the abuse, nor did she assign any responsibility to Michael; instead, Bethany blamed other people. At trial, Bethany continued to demonstrate a disbelief of the confession and a disregard for any risk of

---

[3] Parenthetically, we add that "it is beyond question that sexual abuse is conduct that endangers a child's physical or emotional well-being." In re R.W., 129 S.W.3d 732, 742 (Tex.App.—Fort Worth 2004, pet. denied) (quoting In re R.G., 61 S.W.3d 661, 667 (Tex.App.—Waco 2001, no pet.)). Further, evidence of sexual abuse of one child is sufficient to support a finding of endangerment with respect to other children. See id. Parental knowledge that an actual offense has occurred is not necessary; it is sufficient that the parent was aware of the potential for danger and disregarded that risk. See In re R.G., 61 S.W.3d at 667–68.

abuse that Michael's confession or N.K.'s behavior might suggest. She, instead, characterized him as a good father and his relationship with the girls as strong. Further, even though she testified that she and Michael were separated, they remained married, and Bethany testified that she had made some inquiries into possible reunification therapy with Michael. While it is true that Michael later recanted his confession and denied sexually abusing N.K., Bethany's refusal to acknowledge any degree of risk he may pose in light of his confession demonstrates that she remains unable to adequately protect her children. Renshaw's testimony echoed this observation; she considered the children at risk if they were returned to Bethany's care and concluded that Bethany was not capable of adequately protecting them.

Though less developed in the record before us, there is also evidence of domestic violence between Bethany and Michael, the most notable instance coming from Michael's testimony that Bethany choked him when he sent a text message to a young girl. Abusive or violent conduct by a parent or other resident of a child's home can produce an environment that endangers the child's physical or emotional well-being. In re B.R., 822 S.W.2d at 106.

Based on evidence that Bethany and the two other adults in the home engaged in prostitution from the family home for a number of months, especially when considered with evidence of violent, unstable, and unsanitary living conditions, Michael's admission of sexual abuse of N.K., and Bethany's lack of concern about such admission, the trial court sitting as finder of fact could have formed a firm belief or conviction that Bethany endangered the physical or emotional well-being of the children or placed the children in conditions or surroundings which endangered their physical or emotional well-

being.  See TEX. FAM. CODE ANN. § 161.001(1) (D), (E).  Considering such evidence in a neutral light, the trial court could have arrived at the same conclusion.  We conclude that legally and factually sufficient evidence supports the trial court's finding of a predicate act or omission supporting termination of Bethany's parental rights.  See id.

Best Interest of the Children

Bethany also challenges the sufficiency of the evidence to support the trial court's best interest determination.  In support of the trial court's determination that termination of the parent-child relationship was in the children's best interest, the Department directs us to evidence, in addition to the aforementioned endangering conduct and conditions, that N.K. has improved in residential care but continues to suffer adverse emotional conditions as a result of her home environment and that Bethany has not made sufficient progress in terms of personal or psychological growth to adequately protect the children as demonstrated by her therapists' conclusions, Bethany's own testimony, and by her continued poor decision-making skills.

The Texas Supreme Court has recognized a non-exhaustive list of factors that are pertinent to the inquiry whether termination of parental rights is in the best interest of the child: (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals to promote the best interest of the child, (6) the plans for the child by these individuals or by the agency seeking custody, (7) the stability of the home or proposed placement, (8) the acts or omissions of the parent

18

which may indicate that the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent. See Holley v. Adams, 544 S.W.2d 367, 371–72 (Tex. 1976); see also TEX. FAM. CODE ANN. § 263.307 (West 2008) (providing extensive list of factors that may be considered in determining child's best interest). In examining the best interest of the child, we may consider evidence that was also probative of the predicate act or omission. See In re C.H., 89 S.W.3d at 28. The best interest determination may rely on direct or circumstantial evidence, subjective facts, and the totality of the evidence. In re N.R.T., 338 S.W.3d 667, 677 (Tex.App.—Amarillo 2011, no. pet). The Department need not prove all nine Holley factors, and the absence of evidence relevant to some of those factors does not bar a finding that termination is in the child's best interest, especially in the face of undisputed evidence that the parental relationship endangered the child. See In re C.H., 89 S.W.3d at 27. No one Holley factor is controlling, and evidence of one factor may be sufficient to support a finding that termination is in the child's best interest. In re A.P., 184 S.W.3d 410, 414 (Tex.App.—Dallas 2006, no pet.)

Here, the record reveals a great deal relating to the current and future emotional and physical needs of N.K. She came to the Children's Home, after having been removed from a number of other foster placements, as what Pectol described as a wild, aggressive, troubled child. Pectol detailed N.K.'s emotional state and the measures implemented at the Children's Home in order to meet her emotional and physical needs. And those needs are many and significant. Pectol explained that N.K. has improved as a result of the efforts of the therapeutically trained staff which allow her to feel safer in her surroundings whereas Bethany, by all professional accounts, is not equipped to

meet N.K.'s needs. Lyles testified that, based on his observations during therapy, Bethany seemed frustrated and unable to cope with N.K.'s behaviors. Simply put, Bethany has not made the progress necessary during therapy to recognize or meet the special and demanding behavioral and psychological needs of N.K.

Though the record is less developed as to the current needs and placement of A.M., we make two observations in response. First, that the record reveals little about A.M.'s current foster environment is not fatal to the trial court's finding that termination was also in A.M.'s best interest. See In re L.C., 145 S.W.3d 790, 800 (Tex. App.—Texarkana 2004, no pet.). Secondly, though much of the evidence relevant to the children's best interest specifically refers to N.K., this same evidence serves to demonstrate Bethany's lack of parenting skills and her inability to provide a suitable and protective home, which, of course, applies with equal force to A.M.'s best interest.

Psychological assessments and Bethany's own testimony highlight her parental shortcomings. Renshaw, who performed a psychosexual assessment of Bethany at the Department's request and who also participated in Bethany's ongoing individual therapy, testified that Bethany had not been honest during therapy and had not made sufficient progress to allow the children to be safely returned to her care: "[O]ver time, Bethany has demonstrated that understanding the difference and recognizing the difference between the truth and her fantasy reality is impossible. She has consistently reported one thing to me, and the Department has provided evidence in opposition to the things that she has told me."

Although, Bethany testified, she and Michael remained separated, Bethany admitted that they were still married and that she had discussed with her therapist the possibility of couple's reunification therapy. The very possibility of seeking reunification with Michael, when considered in light of the psychological community's consistent assessment of Michael as a high-risk individual, demonstrates a patent lack of understanding of the gravity of the risk to the children and a grave underestimation of the psychological needs of N.K. in particular. As Rogers explained, Michael is "such a high risk individual, that [he] could never recommend reintegration at this point," and the children would be at "high risk" if returned to a home with him. Renshaw considered the children at risk if they were returned to Bethany's care and testified that Bethany is incapable of being protective of the children and lacked the motivation to make the changes necessary for successful reunification. Ultimately, Renshaw came to the conclusion that termination of Bethany's parental rights is in the children's best interest. Bethany's limited, unimproved parental abilities weigh in favor of the trial court's arrival at the same finding: that termination of the parent-child relationship is in the children's best interest.

Those same parental shortcomings—most notably, her failures to accept responsibility and take a protective posture with respect to the girls—demonstrate a likelihood that N.K. and A.M. would be in emotional and physical danger if returned to Bethany's care. That is, in addition to Bethany's inability to develop adequate parenting skills, she has held open the possibility that she and Michael might reunite which would, on this record, seem to pose an exponential increase in the physical and emotional risk to the girls whether from Michael directly or as a consequence of Bethany's poor

decision-making skills. Further, Bethany's refusal to acknowledge risk or take adequate steps to guard the girls against such risk could also serve as an indicator that the existing parent-child relationship is not a proper one.

Though Bethany has taken part in therapy and classes made available to her by the Department, the consensus among the psychological professionals involved with her is that she has not progressed sufficiently. Consistent with Renshaw's assessment that Bethany had failed to make sufficient progress to attain reunification, Dr. Hoke testified that Bethany's prognosis for significant change was limited, though not impossible. So, while programs would likely be available to Bethany, the record suggests that she may participate in them but may not be gaining the intended benefit from them.

With respect to the stability of the home or proposed placement, we have much in the record that supports the conclusion that N.K. is in an environment where she needs to be: the structured, well-trained, and dedicated care of the Children's Home. It is there where she has shown some improvement and there where she can receive the specialized care and treatment her psychological and emotional demands require. Both Pectol and Jennings testified that N.K. requires such an environment. In contrast, the instability and chaos associated with N.K.'s time in Bethany's care, Pectol's testimony suggests, would exacerbate N.K.'s problems at that time. In fact, as Pectol explained,

any sudden change in N.K.'s environment would likely cause her regression.[4]  N.K. needs stability, and she can receive such at the Children's Home.

Pectol also testified to the detailed plans the Children's Home has designed for the continued care of N.K. and its commitment to helping her continue to improve. Pectol remained open to the possibility that N.K. could eventually find a home with therapeutically trained foster or adoptive parents.  However, from Pectol's testimony, it appears the Children's Home will continue to provide the best care possible for N.K. if that scenario never comes to fruition.  In contrast, Bethany testified very generally regarding her plan to provide for the children:

> To keep my stable employment. I'm hoping that when -- if they were to be sent home, I can become a supervisor at my work and that will give me much of a pay increase.  I plan to – you know, if I need to, apply for government assistance, such as food stamps, Medicaid and things like that.  But that's only if I feel the need. I have insurance at my work that I plan to look into if they're sent home.

When asked about any special plans designed to meet N.K.'s needs, Bethany described plans which were rather vague and tentative, though they did acknowledge N.K.'s special needs: "I would – I was actually going to discuss with my lawyer if it was possible to get training from the Children's Home and I would love to – ."

---

[4] In fact, there is evidence that the instability and chaos of N.K.'s home life was, at a minimum, a contributing factor to her psychological conditions.  For instance, Lyles explained his theory on the possible source of N.K.'s behavior:

> When I see an extreme emotional disregulation in a three-year-old child, that's an indicator of a very chaotic home environment, physical abuse, sexual abuse.  There was no evidence of those in our sessions that I observed, but extreme emotional deregulation is [an] indicator of a very chaotic, unsafe home environment.

Having reviewed the record in the light most favorable to the trial court's findings, we conclude that a rational trier of fact could have reasonably formed a firm belief or conviction that termination of Bethany's parental rights was in the children's best interest. See TEX. FAM. CODE ANN. § 161.001(2). Likewise, viewing the evidence as a whole in a neutral light, a rational trier of fact reasonably could have arrived at the same firm belief or conviction. We conclude that the evidence is legally and factually sufficient to support the trial court's order terminating Bethany's parental rights to her two children and, accordingly, overrule her sole point of error.

## Conclusion

Having overruled the sole issue presented to this Court, we affirm the trial court's orders terminating Bethany's parental rights to N.K. and A.M.

Mackey K. Hancock
Justice