

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

No. 07-13-00117-CV

IN THE INTEREST OF J.J., A CHILD

On Appeal from the County Court at Law No. 2
Potter County, Texas
Trial Court No. 81,095-2, Honorable Pamela Cook Sirmon, Presiding

August 29, 2013

MEMORANDUM OPINION

Before CAMPBELL and HANCOCK and PIRTLE, JJ.

Appellant, Joseph, appeals the trial court's order terminating his parental rights to the now-two-year-old J.J.[1]  On appeal, Joseph contends the evidence is insufficient to support the trial court's order of termination.  We will affirm.

---

[1] Throughout this opinion, appellant will be referred to as "Joseph," and the child will be identified by his initials.  See TEX. FAM. CODE ANN. § 109.002(d) (West Supp. 2012); TEX. R. APP. P. 9.8(b).  The child's mother, "Martha," is not a party to this appeal; her rights were terminated by separate order signed October 31, 2012, which she did not appeal.

Factual and Procedural History

Joseph and Martha had a son together, J.J., in February 2011. During the on-again, off-again relationship between Joseph and Martha, which lasted approximately one year, the Department became involved with Martha with respect to another of her children, a daughter from another relationship, slightly older than J.J., named Z. Joseph knew that the Department was involved with Martha and Z., and he also knew that the Department had removed four other children from Martha's custody in the past, based on allegations relating to her ongoing cocaine problem. According to Joseph, Martha represented to him that the Department's allegations of drug abuse were false, and, he would later testify, he believed her at that time.

Nonetheless, the relationship between Joseph and Martha eventually soured and ended when Martha called the police to report that Joseph had struck her. Joseph was arrested and was held on charges of assault–domestic violence and unlawful restraint. After forty days in jail, Joseph pleaded guilty to both charges in exchange for time served. He promptly moved back to the Dallas area and, he says, started to try to get his life together so that he could get custody of J.J. He would later testify that he repeatedly called Martha to try to gain custody of J.J., but Martha consistently refused to relinquish custody of J.J. One day she did agree, he recalled, but, a few days later, the Department removed J.J. from Martha's care and took custody of him. The Department had removed J.J. after both J.J. and Martha tested positive for cocaine.

Early in the case with the Department, Joseph admittedly moved around a good deal, and this constant instability and relocation made it somewhat difficult, according to the Department's account, to arrange services for Joseph. The record suggests that,

2

when Joseph did get more settled, he ran into some delay at least partly attributable to the Department. Referrals and necessary paperwork were somewhat confused, misdirected, or expired, and this confusion caused a delay in Joseph performing the requirements of his service plan.[2] It would appear that Joseph did, in time, get all the services completed, though the Department questions how much Joseph actually benefitted from those services.

On October 10, 2011, the Department filed its petition seeking the termination of Joseph's parental rights and alleging seventeen separate grounds for such termination. The trial court held a hearing on the Department's allegations on April 10, 2013. At the end of the hearing, the trial court granted the Department's petition seeking termination of Joseph's parental rights. More specifically, it found by clear and convincing evidence that Joseph (1) knowingly placed or knowingly allowed J.J. to remain in conditions or surroundings which endangered his physical or emotional well-being; (2) had engaged in conduct or knowingly placed J.J. with persons who engaged in conduct which endangered his physical or emotional well-being; (3) had failed to support J.J. in accordance with Joseph's ability during a period of one year ending within six months of the date of the filing of the petition; and (4) had failed to comply with the provisions of a court order that specifically established the actions necessary for him to obtain the return of J.J., who had been in the permanent or temporary managing conservatorship of the Texas Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the

---

[2] In fact, it would appear from his testimony that Joseph ultimately ended up calling in a complaint to the Department's main office in an effort to initiate progress with regard to services.

3

abuse or neglect of the child.  See TEX. FAM. CODE ANN. § 161.001(1)(D),(E),(F),(O) (West Supp. 2012).  The trial court also found that termination of the parent-child relationship was in J.J.'s best interest.  See id. § 161.001(2).  The trial court signed its order terminating Joseph's parental rights on April 16, 2013.

Joseph contends on appeal from the trial court's order that the evidence was legally and factually insufficient to sustain the termination of his parent-child relationship with J.J.  In a single issue, he challenges the evidence to support both the predicate act or omission and the best interest determination.  After having reviewed the record, we conclude that the evidence is sufficient as to both elements and will affirm.

Standards of Review

The natural right existing between parents and their children is of constitutional dimensions.  Holick v. Smith, 685 S.W.2d 18, 20 (Tex. 1985); see Santosky v. Kramer, 455 U.S. 745, 758–59, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982).  A decree terminating this natural right is complete, final, irrevocable, and divests for all time that natural right as well as all legal rights, privileges, duties, and powers between the parent and child except for the child's right to inherit.  Holick, 685 S.W.2d at 20.  That being so, we are required to strictly scrutinize termination proceedings.  In re G.M., 596 S.W.2d 846, 846 (Tex. 1980).  However, parental rights are not absolute, and the emotional and physical interests of a child must not be sacrificed merely to preserve those rights.  In re C.H., 89 S.W.3d 17, 26 (Tex. 2002).

The Texas Family Code permits a court to terminate the parent-child relationship if the petitioner establishes (1) one or more acts or omissions enumerated under section

4

161.001(1), and (2) that termination of the parent-child relationship is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001. Though evidence may be relevant to both elements, each element must be proved, and proof of one does not relieve the burden of proving the other. See In re C.H., 89 S.W.3d at 28. While both a statutory ground and best interest of the child must be proved, only one statutory ground is required to terminate parental rights under section 161.001. In re A.V., 113 S.W.3d 355, 362 (Tex. 2003). Therefore, we will affirm the trial court's order of termination if legally and factually sufficient evidence supports any one of the grounds found in the termination order, provided the record shows that it was also in the best interest of the child for the parent's rights to be terminated. See id.

Due process requires the application of the clear and convincing standard of proof in cases involving involuntary termination of parental rights. In re J.F.C., 96 S.W.3d 256, 263 (Tex. 2002); see TEX. FAM. CODE ANN. § 161.206(a) (West 2008). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2008). This standard, which focuses on whether a reasonable jury could form a firm belief or conviction, retains the deference a reviewing court must have for the fact-finder's role. In re C.H., 89 S.W.3d at 26.

In reviewing the legal sufficiency of the evidence supporting an order terminating parental rights, we look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction as to the truth of the allegations sought to be established. See In re J.F.C.,

96 S.W.3d at 266. "To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so." Id. In other words, we will disregard all evidence that a reasonable trier of fact could have disbelieved or found to have been incredible. Id.

When reviewing the factual sufficiency of the evidence supporting a termination order, we determine "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the [Department]'s allegations." In re C.H., 89 S.W.3d at 25. In conducting this review, we consider whether the disputed evidence is such that a reasonable finder of fact could not have resolved the disputed evidence in favor of its finding. In re J.F.C., 96 S.W.3d at 266. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." Id.

Applicable Law and Analysis

Joseph contends that the evidence is insufficient to support a finding of a predicate act or omission that would serve as grounds for terminating his parental rights to his son. The Department responds by pointing to evidence that Joseph left J.J. in Martha's care despite her extensive history of drug abuse and removal of five other children and that Joseph pleaded guilty to charges stemming from a domestic violence incident involving Martha. See TEX. FAM. CODE ANN. § 161.001(1)(D), (E). Joseph also

6

challenges the sufficiency of the evidence that would support the best interest determination. In support of the trial court's determination that termination of the parent-child relationship was in J.J.'s best interest, the Department directs us to evidence, in addition to the aforementioned conduct, which casts doubt onto Joseph's ability to provide J.J. with a stable and protective environment.

Predicate act or omission

Two of the four grounds the trial court found as supporting termination of Joseph's parental rights to J.J. were subsection (D)'s endangering environment or conditions and subsection (E)'s endangering course of conduct. See id. Evidence concerning subsections (D)'s and (E)'s statutory grounds for termination is interrelated; therefore, we will consolidate our review of the evidence supporting these grounds.[3] See In re N.K., 399 S.W.3d 322, 329 (Tex.App.—Amarillo 2013, no pet.); In re I.G., 383 S.W.3d 763, 770 n.6 (Tex.App.—Amarillo 2012, no pet.). Endangerment of the child's physical or emotional well-being is an element of both subsections (D) and (E). See TEX. FAM. CODE ANN. § 161.001(1)(D), (E); see also In re N.K., 399 S.W.3d at 329–30.

"[E]ndanger" means "to expose to loss or injury; to jeopardize." Tex. Dep't of Human Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex. 1987). Although "'endanger' means

---

[3] Indeed, this Court has observed the interrelated nature of evidence that could support these two statutory grounds for termination: "Although the focus of subsection (D) is on the child's living environment and not on the parent's conduct, parental conduct may produce an endangering 'environment.'" In re D.R.J., No. 07-08-00410-CV, 2009 Tex. App. LEXIS 5231, at *7 (Tex.App.—Amarillo July 8, 2009, pet. denied) (mem. op.) (citing In re D.T., 34 S.W.3d 625, 633 (Tex.App.—Fort Worth 2000, pet. denied)). That is not to say, however, that the two subsections require the same evidence. See In re U.P., 105 S.W.3d 222, 236 n.7 (Tex.App.—Houston [14th Dist.] 2003, pet. denied) (discussing the distinctions between subsections (D) and (E)).

more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that the child actually suffers injury." Id.; see In re P.E.W., 105 S.W.3d 771, 777 (Tex.App.—Amarillo 2003, no pet.) (observing that child "need not develop or succumb to a malady" in order to prove endangering conditions). In our review, we not only look at evidence regarding the parent's active conduct, but we also consider evidence showing the parent's omissions or failures to act. In re A.B., 125 S.W.3d 769, 777 (Tex. App.—Texarkana 2003, pet. denied). The Texas Supreme Court has reiterated that endangering conduct is not limited to actions directed toward the child: "It necessarily follows that the endangering conduct may include the parent's actions before the child's birth, while the parent had custody of older children, including evidence of drug usage." In re J.O.A., 283 S.W.3d 336, 345 (Tex. 2009); see In re T.N., 180 S.W.3d 376, 383 (Tex.App.—Amarillo 2005, no pet.).

Martha's Drug Use

"[A] parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct." In re J.O.A., 283 S.W.3d at 345; see In re Z.C., 280 S.W.3d 470, 474 (Tex.App.—Fort Worth 2009, pet. denied). And, with respect to endangering conditions or surroundings, it is not necessary for the parent to have certain knowledge that an actual injury is occurring. In re C.L.C., 119 S.W.3d 382, 392 (Tex.App.—Tyler 2003, no pet.). "It is sufficient that the parent was aware of the potential for danger to the child in such environment and disregarded that risk." Id.

Bearing in mind the two principles that drug abuse in a child's home can be a course of endangering conduct and that a parent bears the responsibility to guard against potential dangers in the child's environment, Texas courts have consistently found that a parent's decision to leave a child in the care of a known drug user is relevant to the predicate acts or omissions outlined in subsections (D) and (E). See, e.g., In re M.C., 352 S.W.3d 563, 568 (Tex.App.—Dallas 2011, no pet.) (holding father's knowledge of mother's drug use and failure to take any action to remove the children from mother's home was sufficient to support finding under subsection (D)); In re M.M., No. 02-08-00275-CV, 2009 Tex. App. LEXIS 5714, at *21 (Tex.App.—Fort Worth July 23, 2009, no pet.) (mem. op.) (holding evidence was sufficient to support findings under subsections (D) and (E) when it showed, among other things, that father knew of mother's drug use); In re J.W.M., 153 S.W.3d 541, 548 (Tex.App.—Amarillo 2004, pet. denied) (finding evidence that mother left children in the care of acquaintances whom mother knew to be drug users to support finding under subsection (E)); In re M.J.M.L., 31 S.W.3d 347, 351–52 (Tex.App.—San Antonio 2000, pet. denied) (holding evidence legally sufficient to support trial court's subsection (E) finding when father left child in mother's care and knew mother was a drug addict).

Here, because there is no evidence to suggest that Joseph used illegal drugs during the relevant time frame, the question becomes what Joseph actually knew of Martha's drug use. In other words, we must examine the evidence that goes to what Joseph knew of Martha's drug abuse at the time he left J.J. in Martha's care.

Joseph relies on his own testimony that he did not know that Martha was using drugs; he "was almost sure that she wasn't." He testified that he would not have left J.J.

9

in Martha's care if he knew that she was using drugs. See In re Z.C.J.L., Nos. 14-13-00115-CV, 14-13-00147-CV, 2013 Tex. App. LEXIS 8284, at *36 (Tex.App.—Houston [14th Dist.] July 9, 2013, no pet.) (mem. op.). The Department cites evidence from Department caseworker Janelle Garrett that Joseph must have known of Martha's rather extensive drug history. The Department also points to Joseph's own testimony that he knew of Martha's history with the Department and that, by his own testimony, he "definitely" knew that four of her older children were in foster care. He also testified that he knew and was concerned that allegations of drug abuse formed the basis of the Department's past allegations with respect to the four removed children, although he claimed that he believed Martha's assurances to him that such allegations against her were false: "she had me fooled, like it was just allegations that were put on her and she didn't do nothing, and from as far as I could see, she didn't do anything." He added, too, that the alleged drug use was from "years ago" at any rate. Also, during the time Joseph and Martha were living together, the Department was involved in monitoring Martha's custody of Z., and Joseph admitted to knowing that was the case. He explained that Martha told him that a friend had called the Department reporting "neglect" of Z. Further, following Joseph's release from jail, he expressed concern that J.J. was in Martha's care, "so [Joseph] asked her to let [him] get him."

Joseph did know that four of Martha's older children were taken from her based on allegations of drug abuse and that, while Joseph and Martha were living together, the Department was in the process of removing a fifth child from her care. He knew enough to be concerned upon his release from jail about J.J. remaining in Martha's care. He claimed that Martha misled him into believing those allegations were false, but

10

the fact remained that he knew the Department had removed four children from her care and were about to remove another. The record contains conflicting evidence regarding the extent of Joseph's knowledge of Martha's drug use. Cf. In re A.M.C., No. 09-12-00314-CV, 2012 Tex. App. LEXIS 10041, \*12–13 (Tex.App.—Beaumont Dec. 6, 2012, no pet.) (mem. op.) (finding that evidence was insufficient to support allegations of endangerment when Department introduced no evidence that father was aware of children's living conditions or that mother was using drugs when children were removed from her custody and noting that "the Department must do more than introduce evidence creating a mere suspicion that would require us to guess that [f]ather, even though he was not living in the home with [m]other and the children, must have known of [m]other's alleged conduct."). Joseph claims that he did not know Martha was abusing drugs, but the record suggests he knew of past drug use or, at a minimum, knew of several allegations of drug abuse and the consequential removal of several children based on those allegations.

It is not for this Court to evaluate the credibility of the witnesses; rather, "the jury is the sole judge of the credibility of witnesses and the weight to be given to their testimony." Golden Eagle Archery, Inc. v. Jackson, 116 S.W.3d 757, 761 (Tex. 2003). The trier of fact may believe all, part, or none of the testimony of any witness. In re T.N., 180 S.W.3d at 382–83. Further, the trial court, sitting as trier of fact, was entitled to resolve conflicts in the testimony regarding whether Joseph knew of Martha's drug use. See In re Z.C.J.L., 2013 Tex. App. LEXIS 8284, at \*38 (citing City of Keller v. Wilson, 168 S.W.3d 802, 819 (Tex. 2005)). The trier of fact could have and, seemingly, did resolve the conflicts in the evidence regarding what Joseph knew of Martha's history

of drug abuse against him.  See In re T.N., 180 S.W.3d at 382–83; see also In re R.W., 129 S.W.3d 732, 742 (Tex.App.—Fort Worth 2004, pet. denied) (reiterating the well-established principle that the fact-finder's function "is to judge the credibility of the witnesses, assign the weight to be given their testimony, and resolve any conflicts or inconsistencies in the testimony").

Domestic Violence Incident

"[A]busive or violent conduct by a parent or other resident of a child's home may produce an environment that endangers the physical or emotional well-being of a child." In re J.T.G., 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.).  We reiterate that "it is not necessary that the conduct be directed at the child or that the child actually suffers injury."  In re N.K., 399 S.W.3d at 330.

Joseph admitted that he pleaded guilty to both assault-domestic violence and unlawful restraint based on charges stemming from the May 2011 incident in which Martha summoned police.  He explained at trial that he did not assault her, that he was attempting to leave her and had packed his bags to leave and stay at his aunt's house when she threatened to call the police and report that he assaulted her.  He did describe how he and Martha had wrestled over the bags he had packed and that, during that scuffle, he had fallen on her.  But, again, he denied that he assaulted her and explained that he pleaded no contest to get out of jail more quickly.  See generally In re C.S., No. 13-13-00095-CV, 2013 Tex. App. LEXIS 9241, at *7–8 (Tex.App.—Corpus Christi July 25, 2013, no pet.) (mem. op.) (not reaching sufficiency of the evidence due to failure to preserve issue but describing similar contentions by a father who had been

12

incarcerated on charges of domestic violence, denied those allegations at termination hearing, but pleaded guilty to "get out of jail quick, and get back to my baby").

Again giving due deference to the trial court as trier of fact, based on the entire record, we conclude that the trial court could have disbelieved Joseph's denial of the assault and could have resolved against Joseph the conflict between his denial and his guilty plea. See In re J.P.B., 180 S.W.3d 570, 574 (Tex. 2005) (per curiam) (concluding that it was within the finder of fact's province to judge father's demeanor and to disbelieve his testimony that he did not know how child was injured); see also In re J.M., No. 02-08-00259-CV, 2009 Tex. App. LEXIS 322, at *18–19 (Tex.App.—Fort Worth Jan. 15, 2009, no pet.) (per curiam) (mem. op.) (observing that trial court sitting as finder of fact could have reasonably disbelieved father's denial of knowledge of mother's drug use and father's account of domestic violence incident in which he denied physically assaulting mother).

Summary

After having reviewed the evidence in the light most favorable to the finding and judgment, we conclude that the evidence is legally sufficient because the trial court, as the judge of witness credibility, could have reasonably disbelieved Joseph's testimony that he did not know Martha was using drugs and could have reasonably resolved against Joseph the disputed evidence surrounding Joseph's alleged act of domestic violence, to form a firm belief or conviction with regard to endangerment under both the course of conduct and environment grounds. See TEX. FAM. CODE ANN. § 161.001(1)(D), (E); In re M.J.M.L., 31 S.W.3d at 351–52 (holding that evidence of

13

course-of-conduct endangerment was legally sufficient when it showed father knew of mother's drug use during pregnancy but abandoned soon-to-be-born baby to her care). Additionally, giving due deference to the trial court's role and duty as finder of fact, using caution to not supplant its judgment with our own, and after reviewing the entire record, we hold that a finder of fact could reasonably form a firm conviction or belief that Joseph had engaged in conduct or had knowingly placed J.J. with persons who had engaged in conduct that endangered his physical or emotional well-being and/or allowed J.J. to remain in conditions or surroundings which endangered his physical or emotional well-being.  See In re H.R.M., 209 S.W.3d 105, 108 (Tex. 2006) (per curiam).  We overrule Joseph's point of error to the contrary.

Best Interest of the Children

There is a strong presumption that a child's interest is best served by preserving the conservatorship of the parents; however, clear and convincing evidence to the contrary may overcome that presumption.  In re R.R., 209 S.W.3d 112, 116 (Tex. 2006) (per curiam).  The Texas Supreme Court has recognized a non-exhaustive list of factors that are pertinent to the inquiry whether termination of parental rights is in the best interest of the child: (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals to promote the best interest of the child, (6) the plans for the child by these individuals or by the agency seeking custody, (7) the stability of the home or proposed placement, (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one, and (9)

14

any excuse for the acts or omissions of the parent. See Holley v. Adams, 544 S.W.2d 367, 371–72 (Tex. 1976); see also TEX. FAM. CODE ANN. § 263.307 (West 2008) (providing extensive list of factors that may be considered in determining child's best interest). In examining the best interest of the child, we may consider evidence that was also probative of the predicate act or omission. See In re C.H., 89 S.W.3d at 28. The best interest determination may rely on direct or circumstantial evidence, subjective facts, and the totality of the evidence. In re N.R.T., 338 S.W.3d 667, 677 (Tex.App.— Amarillo 2011, no pet.).

The Department need not prove all nine Holley factors, and the absence of evidence relevant to some of those factors does not bar a finding that termination is in the child's best interest, especially in the face of undisputed evidence that the parental relationship endangered the child. See In re C.H., 89 S.W.3d at 27. No one Holley factor is controlling, and evidence of one factor may be sufficient to support a finding that termination is in the child's best interest. In re A.P., 184 S.W.3d 410, 414 (Tex.App.—Dallas 2006, no pet.)

It would appear that J.J. has not clearly expressed a desire in this matter, likely due to his tender age. J.J.'s foster mother did describe an incident during which J.J. ran scared from the backyard and hid in his bedroom when he thought that a man, who resembled Joseph and who came into the backyard to perform lawn care, was there to take him from the house. For some time, J.J. would not go into the backyard until his foster parents went back there with him to check it out and show him that no one was back there to take him away. This episode is somewhat relevant to J.J.'s desire to remain with his adoptive family rather than live with Joseph; it certainly demonstrates

that J.J. is fearful of living in or returning to Joseph's care. See TEX. FAM. CODE ANN. § 263.307(b)(5).

Testimony from Nichelle Wiggins, Ph.D. concerning her psychological evaluation of Joseph is relevant to his parenting abilities. See id. § 263.307(b)(6); Holley, 544 S.W.2d at 372. Wiggins expressed concerns regarding Joseph's employment and relationship history, noting that he reported to her that his longest period of continuous employment was a year and a half. At the time she spoke to him, he was unemployed and had six children to support. She also explained that Joseph denied that alcohol had been a problem in his life despite the fact that he was convicted of DWI four times. Such a denial, she explained, demonstrated that Joseph minimizes the issues in his life. In fact, she testified that Joseph reported no concerns or worries at all about anything in his life, an assessment which, in her estimation, was inconsistent with his life circumstances at the time. She did clarify that she was uncertain whether his failure to report any concerns was due to his failure to develop insight or simply his disinclination to share any of his concerns or worries with her. Nonetheless, Joseph's failure to recognize and acknowledge problems in his life could negatively impact his ability to parent. Wiggins also expressed concern regarding Joseph's reported attitudes toward children. She testified that he reported that children are like small adults, an attitude that Wiggins found troubling because it imposes unreasonable expectations and ignores the facts that children have not yet developed the necessary coping resources or sufficient capabilities to defend or care for themselves. Wiggins further testified that Joseph could be doing much more with his life considering his academic functioning.

She noted also that Joseph seemed to shift blame for various arrests earlier in his life and, in doing so, failed to recognize and accept responsibility for his misdeeds.

The record also provides evidence concerning the plans for J.J. by the individuals seeking custody and the stability of the home or proposed placement. The Department plans to facilitate adoption of J.J. into his current foster home which appears to be a caring, devoted home into which J.J.'s maternal half-sister, Z., has already been adopted. J.J. has developed a very close relationship with Z. and his other foster siblings. His foster parents seem dedicated to providing a safe, loving home for J.J. and spent a considerable amount of time and energy into nursing the very ill J.J. back to health when he first came into their home. They worked hard at getting him the necessary medical care and demonstrated a great deal of love and concern for J.J. In that same vein, the foster home meets J.J.'s current emotional and physical needs and expressed its intent to do so into the future.

With respect to excuses for Joseph's acts or omissions, it appears from the record that, when Joseph was released from jail following the domestic violence incident, he was put into a difficult situation with respect to J.J.'s custody. See Holley, 544 S.W.2d at 372. He testified that he did seek custody from Martha and expressed a concern with J.J. remaining in her care. However, considering the risk to J.J., Joseph's efforts were inadequate to protect J.J. from the risk of harm while in Martha's care.

On the topic of the harm to J.J., we must consider the magnitude of the harm done to him. See TEX. FAM. CODE ANN. § 263.307(b)(3); see also In re S.L., 188 S.W.3d 388, 394 (Tex.App.—Dallas 2006, no pet.) (pointing out evidence that father had left

children in care of known drug abuser in evaluation of factual sufficiency of evidence supporting best interest determination). That is, not only was J.J. left in the care of a known drug abuser from whom the Department had removed several other children, he actually tested positive for cocaine, meaning that he somehow ingested cocaine into his system when he was merely months old. Clearly, his exposure to cocaine was not theoretical harm or simply a product of high-risk circumstances, J.J.'s ingestion of cocaine posed a serious and undeniable risk to the infant's physical well-being. The magnitude of the harm done to J.J. while in Martha's care must be weighed in favor of termination. Joseph's attempts to get Martha to agree to relinquish custody of J.J. were inadequate when we look at them in the context of the harm done to J.J. And the inadequacy of his efforts, when he admitted to being concerned about J.J. remaining in Martha's care, could be said to support a finding that the parent-child relationship was not a proper one or, at a minimum, speak to the inadequacy of Joseph's parenting skills and understanding of his role to protect J.J.

Both Joseph and his fiancée expressed a willingness and desire to take care of J.J. From their accounts, the couple maintains a relatively stable and adequately supplied household despite the fact that it is rather full; the couple had full custody of three of the fiancée's seven children, including a special needs child, and had regular possession of Joseph's other five children.[4] The couple testified that, with government assistance and Joseph's current, seemingly steady—albeit still temporary—

---

[4] Joseph's fiancée testified that two of her sons were living by agreement with their father so that their school and extracurricular activities would not be disrupted due to the time the fiancée had to devote to her special needs child. Another of her sons was grown and in the Air Force. Finally, another daughter stayed frequently at the house and served as part-time caretaker for her special needs sister.

employment, their financial resources are adequate to care for all their children and J.J., as well. While the record shows that Joseph had been working for some time at his temporary job, "in considering the best interest of the child, evidence of a recent turn-around in behavior by the parent does not totally offset evidence of a pattern of instability and harmful behavior in the past." See Smith v. Tex. Dep't of Protective & Regulatory Servs., 160 S.W.3d 673, 681 (Tex.App.—Austin 2005, no pet.).

The trial court was called on to consider the relevant factors and use as its guiding presumption that "the prompt and permanent placement of the child in a safe environment is . . . in the child's best interest." See TEX. FAM. CODE ANN. § 263.307(a). In light of the entire record and giving due consideration to evidence that the trial court could have reasonably found to be clear and convincing, we conclude that the trial court could reasonably have formed a firm belief or conviction that termination of Joseph's parental rights is in J.J.'s best interest.

Summary

Having reviewed the record in the light most favorable to the trial court's findings, we conclude that a rational trier of fact could have reasonably formed a firm belief or conviction that (1) Joseph engaged in conduct, or knowingly placed J.J. with a person who engaged in conduct, which endangered J.J.'s physical or emotional well-being and/or knowingly placed or allowed J.J. to remain in conditions which endangered his physical or emotional well-being and (2) termination of Joseph's parental rights was in J.J.'s best interest. Likewise, viewing the evidence as a whole in a neutral light, a rational trier of fact reasonably could have arrived at the same firm belief or conviction.

We conclude that the evidence is legally and factually sufficient to support the trial court's order terminating Joseph's parental rights to J.J. and, accordingly, overrule his sole point of error.

## Conclusion

Having overruled the sole point of error Joseph has presented to this Court, we affirm the trial court's order terminating the parent-child relationship between Joseph and J.J.


Mackey K. Hancock
Justice