In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-14-00280-CV**
_____

**IN THE INTEREST OF A.D. AND B.H**.

**On Appeal from the 317th District Court**
**Jefferson County, Texas**
**Trial Cause No. C-207,873-A**

**MEMORANDUM OPINION**

After a bench trial, the trial court terminated the parental rights of F.F. to her children A.D. and B.H.[1] F.F. appeals the trial court's judgment. She contends that the evidence is legally and factually insufficient to support any of the four statutory grounds for termination pleaded by the Texas Department of Protective and Regulatory Services ("the Department"). She also contends the evidence is legally

---

[1] We identify the minor children by initials to protect their identities. *See* Tex. R. App. P. 9.8. We have identified other members of the family by initials or based upon their relationship to the children. *See id.*

1

and factually insufficient to support the finding that termination was in her children's best interest.[2] We affirm the trial court's judgment.

## Legal and Factual Sufficiency

"The decision to terminate parental rights must be supported by clear and convincing evidence." *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). The Family Code defines clear and convincing evidence as "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2014). This is an intermediate standard and falls between the preponderance standard of ordinary civil proceedings and the reasonable doubt standard in criminal proceedings. *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979); *In re D.T.*, 34 S.W.3d 625, 630 (Tex. App.—Fort Worth 2000, pet. denied) (op. on reh'g). Therefore, the proof must be more than merely the greater weight of the credible evidence, but need not be unequivocal or undisputed. *Addington*, 588 S.W.2d at 570. Before a court may terminate parental rights involuntarily, the factfinder must find by clear and convincing evidence (1) that the parent committed one of the statutory grounds found in section 161.001(1) of the Family

---

[2] The trial court also terminated the parental rights of A.D. and B.H.'s respective fathers, but they have not appealed that determination.

2

Code, and (2) that termination is in the children's best interest. Tex. Fam. Code Ann. § 161.001 (West 2014).

In a legal sufficiency review, we consider all the evidence admitted during the trial "in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We assume the factfinder resolved any disputed facts in favor of its finding, if a reasonable factfinder could do so, and disregarded all evidence that a reasonable factfinder could have disbelieved. *Id.*

In reviewing the factual sufficiency of a termination of parental rights, we "give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing." *Id.* We must determine "'whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations.'" *Id.* (quoting *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* In making our determination, we must undertake "an exacting review of the entire record with a healthy regard for the

3

constitutional interests at stake." *See C.H.*, 89 S.W.3d at 26. However, despite this heightened standard of review, we must "provide due deference to the decisions of the factfinder, who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses." *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014).

## Factual and Procedural Background

The Department first became involved with F.F. and her children in November 2007. Runday Young, a Child Protective Services ("C.P.S.") investigator, testified that she was called on November 27, 2007 to investigate allegations that F.F. and B.H. tested positive for PCP at the time of B.H.'s birth. As part of her investigation, Young spoke with F.F. Young testified that F.F. told her that she had used drugs two days prior to the birth of B.H. F.F. also told Young that F.F. had been diagnosed with bipolar disorder. Young testified that F.F. told her that she had received prenatal care from Dr. Hawkins, but when Young contacted Dr. Hawkins's office, Young was unable to obtain proof that F.F. had received prenatal care.

Young testified that C.P.S. asked F.F. to participate in a drug assessment and treatment program and to follow the recommended assessments she received. Young testified that F.F. completed an inpatient treatment program and was

4

advised to complete an aftercare program with Narcotics Anonymous (NA) or Alcoholics Anonymous (AA). While F.F. was completing her inpatient and outpatient services, C.P.S. had placed the children with an aunt. According to Young, C.P.S. determined that F.F. was a very needy client and would require "[a] lot of assistance" to succeed. Young testified that F.F. eventually completed her service plan requirements and C.P.S. determined that the children could be returned.

In July 2008, the Department once again had to intervene. According to records entered into evidence at trial, in July 2008, Beaumont police officers found F.F. and her boyfriend intoxicated while caring for A.D. Officers reportedly found cocaine on the mantel in the home and a semi-automatic gun inside a storage bin on which A.D. was sitting. The children were removed from F.F.'s care and placed with relatives, but were eventually returned to F.F.

F.F. denied at trial that the children were removed from her in July 2008 because of drug use, but claimed it was due to violence in the home. F.F. admitted that a gun was found in her home, but she denied that she knew the gun was present and explained that she allowed one of her children's fathers to stay at her home and he brought the gun. F.F. admitted that the child's father she allowed into her home had been violent towards her and had been to prison several times. F.F.

initially testified that she would let the child's father be involved with the children if he wanted to be involved, but later recanted this testimony and denied that she would allow him to see the children. F.F. testified that she did not know the child's father had been arrested twenty-seven times in Jefferson County since 2007, but contends that when he was out of jail he took very good care of both of her children.

In December 2008, less than six months after the prior intervention, the Department again had to remove the children from F.F.'s care. Evidence in the record documents that, in December 2008, C.P.S. found "Reason to Believe Physical Abuse of [A.D.] and [B.H.]." C.P.S. removed the children from the home after a physical altercation between F.F. and B.H.'s father, during which B.H. was thrown to another person in the room. The children were returned to F.F. in July 2009.

In September 2009, the Department opened another investigation concerning F.F. and her children. Robin Snoek was an investigator for C.P.S. in 2009. In December 2009, Snoek was called upon to investigate F.F. in regards to her parenting of the children. Snoek testified that C.P.S. had opened a case in September 2009, but C.P.S. merged that case with another case that it opened in December 2009. According to Snoek, F.F. had been tested for drugs in October

6

related to the September case and had received a positive lab test result, but by the time C.P.S. received the results, the September case had been dismissed. Snoek recalled that she spoke to F.F. about the positive result and F.F. denied using PCP, but said she had smoked a cigarette from somebody. Snoek understood F.F.'s response as implying that someone had given her a cigarette laced with PCP. Snoek recalled that F.F. asked her if PCP could be transmitted through sexual contact, also implying that the drugs in her system resulted from sexual contact and not her own intentional drug use. Snoek testified that because PCP was historically a problem for F.F., the positive test result raised a red flag with C.P.S. Snoek recalled that when C.P.S. requested F.F. to take an additional drug test, F.F. delayed taking the test for a couple of days. When F.F. eventually submitted to being tested in December, she tested positive again for PCP. Considering F.F.'s history of drug abuse, when F.F. again tested positive for PCP, C.P.S. decided to remove the children from her care.

Snoek recalled that when she attempted to remove the children, F.F. told her that the children were with their grandmother in Georgia. When Snoek contacted the grandmother and told her that law enforcement was going to come and perform a welfare check on the children, the grandmother informed Snoek the children were actually not with her, but in Alabama with their aunt. Snoek then called the

aunt in Alabama and informed her that law enforcement was going to come by and perform a welfare check on the children. Snoek testified that the aunt told Snoek that the children were leaving her house right then to come back to Texas. Snoek became concerned that F.F. was hiding the children from C.P.S. After contacting the children's school and learning that the children had been in school, Snoek determined that the children were probably not out of state as F.F. had told her. Snoek testified that C.P.S. removed the children from F.F.'s care. Snoek recalled that when she spoke with F.F. during this time, F.F.'s speech was slurred and difficult to understand. Snoek believed F.F. was under the influence of some type of drug. F.F. eventually completed her services with C.P.S., and, as a result, C.P.S. returned the children to F.F.

In April 2013, the Department once again became involved with F.F. after she allegedly caused an auto accident on April 4, 2013. Officer Isiah Volrie, a Beaumont patrol officer, testified that he was dispatched to an auto accident involving F.F. and B.H. on April 4, 2013. When he arrived at the scene, Volrie found F.F.'s vehicle engulfed in flames. F.F. was not taking care of B.H. when he arrived. He observed that an older black male was caring for B.H. Volrie testified that B.H. had received burns to the right side of her face. Because of her injuries, B.H. was taken to the hospital.

From his observations, Volrie believed that F.F. failed to stop at a stop sign and hit another vehicle. Volrie testified that "[F.F.'s] vehicle hit the other [vehicle] with enough power to move it down the street and to keep going and then hit a sign and demolished [the sign]." During his investigation, Volrie spoke with F.F. When he arrived at the scene, Volrie found F.F. lying on the ground, repeatedly asking if her daughter was okay. He noticed that F.F. "had a very lethargic demeanor" and though she responded to his questions, F.F.'s only response was asking, "'Is my daughter okay[?]'" Volrie testified that he has investigated multiple DWI and public intoxication cases. Because of his experience and training, Volrie recognized the smell of phencyclidine ("PCP") on F.F.'s breath and person. Volrie testified that he started getting a headache as soon as he encountered F.F., which was his body's normal response to smelling PCP. Volrie did not administer any field sobriety tests because he did not believe that F.F. was capable of performing the tests. Volrie did not find any drugs on F.F.'s person. Volrie asked F.F. whether she remembered what had happened in the accident, and she could not recall the circumstances that led to the accident. Because F.F. appeared intoxicated and had been in a traffic accident, Volrie believed she needed medical attention. Volrie did not recall if the hospital performed any sobriety tests on F.F., but he did recall that the hospital took a blood sample from F.F.

9

Because of F.F.'s demeanor and actions, Volrie determined that she was under the influence of intoxicants. According to Volrie, when F.F. was requested to speak, she was unable to answer even simple questions. He believed that F.F. did not have the normal use of her mental or physical faculties. Volrie detained F.F. in his patrol car and ultimately arrested her for two counts of intoxication assault and one count of intoxication assault and injury to a child. Volrie did not recall if field sobriety tests were later performed on F.F. at the jail. Based on his investigation, Volrie believed that F.F. was responsible for the auto accident. Volrie also testified that he believed B.H. was placed in a situation by F.F. that endangered her physical and emotional well-being.

State's counsel indicated at trial that the district attorney had deferred filing charges against F.F. pending further investigation. At trial, F.F. invoked her Fifth Amendment right against self-incrimination on all questions dealing with the allegations surrounding the auto accident. We also note that C.P.S. attempted to gather information from F.F. the day after the accident and she refused to disclose any information, including where her children were located, where she resided, where the children attended school, and the name of the children's physician.

Keri Louviere, the program director at CASA of Southeast Texas, testified at trial. In her former employment with C.P.S., Louviere had been involved with F.F.

and her children during the three different removals. Louviere characterized F.F. as a high-maintenance client and indicated that F.F. had required a great deal of assistance in 2008 and 2009 in completing her services. She recalled that each time the children had been removed from F.F.'s care, they were in C.P.S.'s care for at least a year before being returned to F.F.

Louviere testified that F.F.'s association with criminals concerned the Department as both A.D. and B.H.'s fathers have very lengthy criminal histories. Louviere testified that the presence of drugs and violence in the home was also a concern for the children's welfare while with F.F. According to Louviere, F.F. had placed A.D. and B.H. in circumstances and had engaged in conduct that had endangered their physical and emotional well-being.

F.F. testified on her own behalf at trial. She testified that after the accident she voluntarily entered into and completed a parenting skills class, attended counseling, received a drug assessment and completed outpatient treatment, and started attending church. According to F.F., she did these things to try to prove to C.P.S. that she was a fit mother that deserved her children.

F.F. explained that to complete the outpatient treatment she had to be drug-free for the duration of the program. According to F.F., she maintained sobriety throughout the program, which started in May 2013 and finished at the end of

11

January 2014. She explained that the outpatient treatment she received included a requirement that she attend AA or NA meetings. F.F. testified that she continues to attend AA meetings weekly and has a sponsor. F.F. claims that she has been sober for two years.

F.F. testified that while undergoing her treatment she had been able to provide a stable home for herself. However, when C.P.S. attempted to obtain F.F.'s address to evaluate her residence, F.F. refused to provide the address. Other than F.F.'s testimony that at some point prior to trial she had a stable home for herself, there is no evidence in the record to support her claim.

F.F. testified that she has chosen to spend her time with positive people. F.F. testified that she is receiving counseling for her bipolar disorder, but she could not recall the name of her counselor. F.F. has taken medication for bipolar disorder in the past, but because she did not like her old medication, her new counselor was allegedly trying to find her a new medication to try. Therefore, the record suggests that F.F. was not on medication for her bipolar disorder at the time of trial.

A number of people testified on behalf of the mother. B.H.'s paternal aunt described F.F. as "a loving person." B.H.'s aunt testified that the children love F.F. and "wouldn't want to leave their mother for anything." She testified that F.F. provides for the children's wants and needs. B.H.'s aunt testified that when F.F. is

12

at school, she helps F.F. by taking care of the children. B.H.'s aunt testified that she did not believe that F.F. has a drug problem and denied ever having been around her when she was under the influence. She testified that in the past two years she has seen no evidence of a drug abuse problem. B.H.'s aunt testified that F.F. has a good support system from B.H.'s family members. It was her opinion that F.F. is in a position to care for and raise her children properly.

On cross-examination, B.H.'s aunt agreed that the children were recently placed with B.H.'s other paternal aunt. She admitted that the children were removed from that aunt's care because there was an allegation that B.H.'s aunt had spanked the children. She also admitted that there were times when she and B.H.'s other aunt told C.P.S. that F.F. was saying things about them that were not true.

B.H.'s paternal grandmother also testified on behalf of F.F. She testified that she spoke with F.F. by telephone for about thirty minutes the day the auto accident occurred. While she did not recall F.F. acting unusual, she did not indicate what time her conversation took place in relation to the accident other than stating the conversation took place earlier in the day.

B.H.'s grandmother testified that she has known F.F. for about seven to eight years and described their relationship as "good" and "okay." She testified that she interacts with F.F. almost daily and babysits for F.F. She testified that when

13

her son, B.H.'s father, was away, "[she] just took over." She testified that F.F. primarily receives help from her and B.H.'s other family members.

B.H.'s grandmother testified that she believes F.F. is capable of raising and providing for the children in a safe and stable environment. She testified that she believes that F.F. is a "good parent." She qualified this by stating that F.F. feeds the children, dresses them nicely, plays with them, talks to them, takes them out, and is involved in their school. She testified that F.F. controls and disciplines the children appropriately.

B.H.'s grandmother testified that she is aware that F.F. has had drug problems, but believes that she is trying to do what she needs to do as a mother to help herself so that she could help her kids. She believes that F.F. has been drug-free for the last year and a half and has made progress. However, B.H.'s grandmother admitted that she worries that her granddaughter may eventually end up dead.

Two friends of F.F. testified on her behalf. Both friends described a relationship with F.F. for the past ten to fifteen years. Both friends testified that during their friendship with F.F. they often interacted with F.F. and the children.

One of her friends described F.F. as being "a good mother." She explained that F.F. made sure the children "had everything they needed." She testified that

the children were affectionate towards F.F. and had a good relationship with her. This friend further testified that she believed F.F. would provide a safe, stable environment for the children. She testified that during the time that she has known F.F., the children had lived with F.F. and F.F. was primarily raising them and doing a good job. However, on cross-examination, this same friend admitted that the children had been in foster care twice during this same time period. She also admitted that she had no knowledge that F.F. had a drug abuse problem, was surprised by the allegations of PCP abuse, and was wholly unaware that F.F. had attended drug rehabilitation or AA or NA meetings.

F.F.'s other friend testified that she believes F.F. has always taken care of her children. She testified that F.F. provided for the children and that they wanted for nothing. She testified that the children were always with their mother. F.F. made sure the children's hygiene was maintained, made sure that they went to school, helped them with their homework, and made sure they were appropriately fed and clothed. She testified that the children listened to and respected F.F. She did not see any danger with placing the children with F.F. and believed that F.F. only left the children in safe environments.

Even though this friend claimed to have been close friends with F.F., she was unaware that the children had been removed from F.F. on two prior occasions.

15

She testified that she does not believe that F.F. has an active drug problem. She testified that she has seen no evidence of drug use in the past two to three years.

**Grounds for Termination**

In her first issue, F.F. contends the trial court's findings were legally and factually insufficient to support any statutory factor under section 161.001 of the Texas Family Code. The trial court found four predicate grounds for terminating F.F.'s parental rights: subsections D, E, P, and R of section 161.001(1). *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (P), (R). The trial court found that F.F. had:

- knowingly placed or knowingly allowed the child(ren) to remain in conditions or surroundings which endanger the physical or emotional well-being of the child(ren) [subsection D];

- engaged in conduct or knowingly placed the child(ren) with persons who engaged in conduct which endangers the physical or emotional well-being of the child(ren) [subsection E];

- used a controlled substance . . . in a manner that endangered the health or safety of the child(ren), and (1) failed to complete a court-ordered substance abuse treatment program; or (2) after completion of a court-ordered substance abuse treatment program, continued to abuse a controlled substance [subsection P]; [and]

- been the cause of the child(ren) being born addicted to alcohol or a controlled substance, other than a controlled substance legally obtained by prescription . . . [subsection R][.]

*See id.* For the reasons we discuss below, we conclude that the record contains sufficient evidence to support the trial court's finding that F.F. "engaged in

16

conduct or knowingly placed [her children] with persons who engaged in conduct which endangers the physical or emotional well-being of the [children][.]" *See id.* § 161.001(1)(E).

The predicate condition under section 161.001(1)(E) is satisfied if the parent has "engaged in conduct . . . which endangers the physical or emotional well-being of [her children][.]" *See id.* The Texas Supreme Court has defined "'endanger'" to mean "to expose to loss or injury; to jeopardize." *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). Endanger means more than just a threat of a metaphysical injury or a possible ill effect from a less-than-ideal family environment. *Id.* at 533. However, the statute does not require a parent's actions to be directed toward the child or for the child to suffer actual injury for the court to find endangering conduct. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). The relevant inquiry is whether evidence exists that the endangerment was the direct result of the parent's conduct, including acts, omissions, and failures to act. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Termination under subsection E must be based on more than a single act or omission—there must be a voluntary, deliberate, and conscious course of conduct by the parent. *In re C.A.B.*, 289 S.W.3d 874, 883 (Tex. App.—Houston [14th Dist.] 2009, no pet.). In determining whether the endangering course of conduct has been established,

17

the reviewing court may consider evidence of conduct that occurred both before and after a child's birth. *Id.*

To support her position that the evidence was insufficient to support a finding under subsection (E), F.F. focuses on the failure of C.P.S. to obtain a recent positive drug test, the failure of the district attorney's office to indict her for charges related to the auto accident, her own testimony at trial that she is no longer abusing drugs, and the lack of any witness testimony at trial of having observed F.F. abuse drugs since December 2010. However, the trial court heard testimony from the officer that arrived at the scene of the auto accident. The officer testified that he was familiar with PCP, knew what it smelled like, and that his body responded uniquely to the odor of PCP. The officer testified that not only did he smell PCP on F.F.'s person and breath, but F.F. was also incoherent and not in control of her mental and physical faculties. The medical records admitted at trial indicate that F.F. was not verbal at the accident scene and was unable to provide consent for B.H. to be transported to the hospital. EMS crew members indicated in their records that B.H.'s mother was "not fully legally competent at the time to sign due to MVC[.]" However, there is no evidence that F.F. had suffered an injury in the accident. Other than the officer's belief that F.F. was under the influence of PCP, there is no other explanation in the record for F.F.'s incoherent state.

F.F. maintains that she is sober and no longer abusing substances. However, the trial court heard evidence of F.F.'s struggle with maintaining sobriety. While F.F. testified that she successfully completed a third drug rehabilitation program and was attending AA, there is no evidence in the record that would compel the factfinder to conclude that F.F. now has the skills to permanently maintain her recovery. In fact, the record shows F.F. has twice before allegedly attained sobriety and failed to maintain her recovery after the Department returned her children to her. The trial court heard evidence of F.F.'s destructive cycle—F.F. abuses drugs which leads to C.P.S. removing the children; F.F. gets sober for a short period of time and C.P.S. returns the children; F.F. starts abusing drugs again and C.P.S. has to remove the children; F.F. gets sober for a short period of time and C.P.S. returns the children. "[E]vidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of drug use and irresponsible choices." *J.O.A.*, 283 S.W.3d at 346. Moreover, the trial court may infer from past relapses that similar conduct will recur if the children are returned to her. *See In re I.C.W.*, No. 02-12-00226-CV, 2013 WL 173746, at *13 (Tex. App.—Fort Worth Jan. 17, 2013, no pet.) (mem. op.).

The trial court could have reasonably considered the evidence of illegal drug use by F.F. to find that F.F. engaged in a conscious course of conduct that

19

endangered her children. *See J.O.A.*, 283 S.W.3d at 345 ("[A] parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct."); *In re M.R.*, 243 S.W.3d 807, 821 (Tex. App.—Fort Worth 2007, no pet.). The latest incident involving the auto accident is evidence that F.F. continued to abuse drugs in April 2013 and, in this incident, she also operated a motor vehicle in an impaired state with B.H. unrestrained in the front seat of the vehicle. F.F. was in such an impaired condition that a bystander had to rescue B.H. from the burning vehicle. As a result of F.F.'s conduct, B.H. received serious burns and abrasions over the right side of her face and neck.[3] And, this was not the first or only instance where F.F.'s drug abuse negatively affected her children. B.H. tested positive for PCP at birth, and F.F. admitted to using drugs two days before B.H.'s birth. F.F. has become intoxicated in the presence of her children and in that state, allowed them to be in close proximity to cocaine and a semi-automatic weapon. The trial court also heard evidence that as a result of F.F.'s choices, the children have been exposed to violence and domestic abuse. Because of F.F.'s lack of stability, the children have been in and out of foster care most of their lives.

Viewing the evidence in the light most favorable to the endangerment finding under subsection (1)(E), we conclude that the trial court reasonably could

---

[3] We note that the record indicates that fortunately, B.H. recovered fully from her injuries related to the auto accident.

20

have formed a firm belief or conviction that F.F. "engaged in conduct . . . which endanger[ed] the physical or emotional well-being of [her children]." *See* Tex. Fam. Code Ann. § 161.001(1)(E). Based on our review of the entire record, we further conclude that the evidence is such that the trial court reasonably could have formed a firm belief or conviction about the truth of the State's endangerment allegations against F.F. *See C.H.*, 89 S.W.3d at 25. We, therefore, conclude that the evidence was legally and factually sufficient to support the trial court's finding under section 161.001(1)(E). We overrule F.F.'s first issue.[4]

## Best Interest of the Child

The trial court found that termination was in the children's best interest. *See* Tex. Fam. Code Ann. § 161.001(2). In her second issue, F.F. contends the evidence is legally and factually insufficient to support this finding. She argues the evidence at trial weighs against this finding because the evidence showed: the children loved her, she was doing everything she could to get them back, she had taken extra classes, she had registered for college, she found stable housing, and she had remained drug-free.

---

[4] We need not address the sufficiency of the evidence to support a violation of subsections (1)(D), (P), or (R). *In re D.S.*, 333 S.W.3d 379, 388 (Tex. App.—Amarillo 2011, no pet.) ("If multiple predicate grounds are found by the trial court, we will affirm based on any one ground because only one is necessary for termination of parental rights.").

Regarding the children's best interest, we consider a non-exhaustive list of factors: (1) desires of the child; (2) emotional and physical needs of the children now and in the future; (3) emotional and physical danger to the children now and in the future; (4) parental abilities of the individual seeking custody; (5) programs available to assist this individual to promote the best interest of the children; (6) plans for the children by this individual or by the agency seeking custody; (7) stability of the home or proposed placement; (8) acts or omissions of the parent which may indicate that the existing parent-child relationship is not proper; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976); *see also* Tex. Fam. Code Ann. § 263.307(b) (West 2014). In reviewing the trial court's decision to terminate a parent's relationship with a child, we consider that "there is a strong presumption that the best interest of a child is served by keeping the child with a parent." *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). The party seeking termination need not prove each *Holley* factor favors termination. *C.H.*, 89 S.W.3d at 27. A trial court's best interest finding "is not dependent upon, or equivalent to, a finding that the child has been harmed by abuse or neglect or is in danger of such harm[,]" but rather it "is a term of art encompassing a much broader, facts-and-circumstances based evaluation that is accorded significant discretion." *In re Lee*, 411 S.W.3d 445, 460 (Tex. 2013).

While neither child testified at trial, there is evidence in the record that both children loved their mother and wanted to be with her. A.D. and B.H. were ages nine and five, respectively, when they were removed from F.F.'s care in 2013. There is no indication in the record that either child was sufficiently mature in age to judge the circumstances and express a preference as to her placement. *See In re A.R.*, 236 S.W.3d 460, 480 (Tex. App.—Dallas 2007, no pet.) (op. on reh'g).

In evaluating children's needs, we consider the need for stability and permanence in a child's life. *See In re T.G.R.-M.*, 404 S.W.3d 7, 17 (Tex. App.—Houston [1st Dist.] 2013, no pet.) ("Stability is important in a child's emotional and physical development."). As detailed above, the children have been in and out of the C.P.S.'s care for most of their short lives due to their mother's lack of stability. The children have been exposed to drug abuse and violence and have developed behavioral problems and substantial emotional needs.

A psychological evaluation was performed on A.D. in April 2010 and in December 2013  Both evaluations were admitted at trial.  In April 2010, A.D. was six years old.  According to the evaluation, A.D. recalled "the police [coming] to their home 'because they were having a fight and saw some drugs and Daddy and Mommy both went to jail[.]'"  The evaluation also indicates that A.D. "has seen her parents use 'powder things and you put it up in your nose[.]'" In the evaluation,

23

the psychologist noted that A.D. was suspended from school due to behavioral problems and concluded that A.D. needed intensive psychotherapy due to post-traumatic stress disorder reenactment behaviors. In December 2013, A.D. was ten years old. According to the psychologist's evaluation, A.D. "meets the criteria for diagnosis of an Adjustment Disorder, with depression and anxiety as well as conduct problems." In the report, the psychologist recommended that A.D. continue to live in her current foster home and not be returned to her mother but rather be placed permanently in a foster or adoptive home. The report from CASA was also entered into evidence at trial. The CASA report indicates that B.H. has been diagnosed with Adjustment Disorder with disturbance of conduct and receives counseling for this condition. The CASA report also recommends that B.H. not be returned to her mother's care.

F.F.'s friends and family testified that F.F. could care for the children appropriately; however, most of those same individuals were unaware of the F.F.'s struggles with drug abuse and her past failures to meet the children's needs. Furthermore, even though B.H.'s grandmother indicated that she thought F.F. could care for the children, she also admitted that she was worried that her granddaughter would ultimately end up dead because of F.F.'s lifestyle.

F.F. testified that she completed a drug abuse rehabilitation program, attended counseling, and completed a parenting course. While these steps are laudable, the trial court could have reasonably questioned whether F.F. had really improved. F.F. had completed drug rehabilitation programs and parenting courses multiple times in the past, yet reverted to a lifestyle destructive to both herself and her children. There was also evidence from which the trial court could have reasonably inferred that F.F. is currently not taking medication for her bipolar disorder.

F.F. testified that while she attended the rehabilitation program she was able to provide a stable home for herself. However, the program ended in January 2014, and there is no evidence in the record that F.F. continued to reside in a stable home following the completion of the program. Moreover, there is no evidence in the record that F.F. had a home suitable for children or that she possessed the means to maintain a stable home for her children. C.P.S. reported that as of June 24, 2013, F.F.'s home environment was unknown because F.F. had refused to provide C.P.S. with a current address. The trial court could have reasonably concluded that the stability of F.F.'s home remained in question.

F.F. testified that she wanted to go back to school but did not have time to do so because of all the parenting and drug addiction classes she was attending.

25

F.F. provided no testimony as to how she would logistically care for the children while she attended school. She also provided no testimony regarding how she would financially support the children, as she never indicated that she was employed. F.F. also did not state how she planned to meet the children's identified therapy needs.

If F.F.'s parental rights were terminated, the Department's plan was for the children to continue in the therapeutic foster home until such time as they are adopted. According to CASA's report, both A.D. and B.H. are doing well in their current foster home. According to the 2013 psychological evaluation, A.D. believed she had a good relationship with her foster parents. The psychological evaluation acknowledged A.D.'s past behavioral problems, but noted that since her current foster placement A.D. has not continued to exhibit behavioral problems.

We must assume the trial court resolved any evidentiary conflicts in favor of its finding if it was reasonable to do so. *See In re N.K.*, 399 S.W.3d 322, 328 (Tex. App.—Amarillo 2013, no pet.) (citing *J.F.C.*, 96 S.W.3d at 266-67). Given F.F.'s history of being dishonest with C.P.S., the conflicts present within her testimony, and the testimony of others who testified on her behalf, we conclude that it was reasonable for the trial court to resolve the conflicts against F.F. and in favor of the verdict.

Viewing the evidence in the light most favorable to the best interest finding, we conclude the trial court reasonably could have formed a firm belief or conviction that termination was in the best interest of both children. Based on our review of the entire record, we further conclude that the trial court could reasonably have formed a firm belief or conviction that it would be in the best interest of both children for F.F.'s parental rights to be terminated. The evidence is both legally and factually sufficient to support the best interest finding. We overrule F.F.'s second issue.

Having overruled all of F.F.'s issues on appeal, we affirm the trial court's judgment.

AFFIRMED.

_____
CHARLES KREGER
Justice

Submitted on October 7, 2014
Opinion Delivered December 11, 2014

Before McKeithen, C.J., Kreger, and Horton, JJ.