

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-23-00477-CV

_____

IN THE INTEREST OF H.C., A CHILD

---

On Appeal from County Court at Law No. 2
Parker County, Texas
Trial Court No. CIV22-0708

---

Before Sudderth, C.J.; Womack and Walker, JJ.
Memorandum Opinion by Justice Womack

# MEMORANDUM OPINION

## I. INTRODUCTION

Mother and Father (collectively, the Parents) appeal from the trial court's order terminating their parental rights to H.C. (Holly).[1] We affirm the trial court's order.

## II. BACKGROUND

Mother and Father met and started dating in 2019. Mother gave birth to a child (Amy) in July 2021. During parental-termination proceedings concerning Amy, it was discovered that Father was not Amy's father. The couple broke up, but Mother was already pregnant with Holly. Father is Holly's father.

Holly was born in 2022 prematurely with a low birthweight. Her meconium tested positive for methamphetamine and amphetamine. Department of Family and Protective Services (the Department) Investigator Wendy Baker attempted to speak with Mother at the hospital after Holly's birth, but Mother refused to talk with her. Baker spoke with Father and his mother at their home in Fort Worth and noted that the home contained no items needed to care for a baby. Father and his mother told Baker that Mother did not live there.

---

[1]This appeal erroneously identified the child as H.G. when the appeal was docketed. That error has been corrected. Regardless, we use pseudonyms to identify the children, and we identify family members by their relationship to the children. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

The Department attempted to have the Parents drug tested to avoid removing Holly, but neither Mother nor Father complied with the Department's request. The Department also attempted to place Holly with family members, but the family members identified for possible placement either declined or did not respond to the Department's request. Thus, Holly was placed in foster care.

The Department then filed a petition on November 14, 2022, for Holly's protection and for termination of the Parents' rights. The trial court held an adversary hearing, which the Parents attended, on December 14, 2022, and issued temporary orders requiring the Parents to submit to "court-ordered" psychological evaluations; to attend counseling; to comply with the Department's family service plan; to submit to "court-ordered" drug- and alcohol-dependency assessments; and to submit specimens, "as directed by the Department and at times to be determined by the Department, for analysis by a drug[-]testing laboratory." The trial court separately ordered Father to "attend, participate in[,] and successfully complete parenting classes . . . ." The trial court also ordered the Parents to submit to drug testing within two days. The Parents failed to take this test.

Seven days later, the Department filed family service plans for the Parents. Each plan addressed the temporary orders' requirements and included a "Court Ordered" notation for each requirement. All of the requirements on Mother's plan indicated "Court Ordered: No." Only the parenting-skills requirement on Father's plan indicated "Court Ordered: Yes"; the rest indicated "Court Ordered: No."

3

The trial court held a status hearing, which neither Parent attended, on January 5, 2023, and issued a status-hearing order reflecting a finding that neither Parent had reviewed or signed their respective family service plan. The order also approved of and incorporated the Department's family service plans, ordered each Parent to pay child support, established supervised visitation, and notified the Parents that the supervision level could be reduced only if they "cooperate[d] with the Department and engaged in [their] 'Family Plan of Service.'" The trial court also ordered the Parents to submit to drug testing "before 4:00 p.m." on the day the order was issued. The Parents failed to take this test.

Four months later, on May 4, 2023, the trial court held an initial permanency hearing, which only Father attended. The trial court found that neither Parent had "demonstrated adequate and appropriate compliance with the service plan," that the Parents presented "a continuing danger to [Holly's] physical health and safety," and that returning Holly to either Parent was "contrary to [her] welfare." The trial court continued supervised visitation and again notified the Parents that the supervision level could be reduced only if they complied with their family service plans. The trial court reincorporated the Department's family service plans into its permanency-hearing order and ordered the Parents to submit to drug testing "immediately following court" on the day the order was issued. They did not comply. Later, at trial, Father testified that he did not take the test because he "had other things to do."

The trial court held a second permanency hearing on June 15, 2023, that the Parents attended. The trial court again found that the Parents had not complied with their family service plans and still presented "a continuing danger to [Holly's] physical health and safety." Thus, returning Holly to either Parent was "contrary to [her] welfare." The trial court continued supervised visitation and again notified the Parents that the supervision level could be reduced only if they complied with their family service plans. The trial court reincorporated the Department's family service plans into its order and ordered the Parents to submit to drug testing on the day the order was issued. They did not comply.

The trial court held a final permanency hearing on October 12, 2023, that only Mother attended. The trial court again found that the Parents had not complied with their family service plans and still presented "a continuing danger to [Holly's] physical health and safety." Thus, returning Holly to either Parent was "contrary to [her] welfare." The trial court continued supervised visitation. To have the supervision level lowered, each Parent was required (1) to "comply with drug testing requests" and "provide negative drug test results"; (2) to "complete the family plan of services as [o]rdered by [the court]"; (3) to "demonstrate [that] he/she is safe and appropriate"; and (4) to demonstrate that "his/her home is safe, stable, drug-free, violence-free, and appropriate for [Holly]." The trial court reincorporated the Department's family service plans into its order and again ordered the Parents to submit to drug testing on the day the order was issued. Yet again, they did not comply.

In all, the Department ordered sixteen separate drug tests for Mother—eight urinalyses and eight hair-follicle tests—and seventeen separate drug tests for Father—eight urinalyses and nine hair-follicle tests. Each Parent either failed to take or failed to pass all but one drug test.

The trial court held the trial on December 7, 2023. Mother appeared through counsel, and Father appeared pro se. The trial court issued its termination order on December 8, 2023, terminating Mother's parental rights under Subsections 161.001(b)(1)(D), (E), (O), and (P) of the Texas Family Code; terminating Father's parental rights under Subsections 161.001(b)(1)(E) and (O); and finding that termination was in Holly's best interest. This appeal followed.

## III. DISCUSSION

In eight issues—two for each subsection at issue—Mother asserts that the evidence is legally and factually insufficient to support the trial court's findings. Acting pro se, Father also filed a notice of appeal but filed a noncompliant brief consisting of five pages with no party identification, record or authority citations, statement of the case, statement of facts, summary of the argument, prayer, or appendix. *See* Tex. R. App. P. 9.4(i); 38.1(a), (c), (d), (g), (h), (j), (k). We notified Father of his brief's deficiencies and requested a corrected brief. We further notified him that we may strike his brief and dismiss his appeal or deem his noncompliant issues waived if he did not file a corrected brief. *See* Tex. R. App. P. 9.4(k). He did not file one.

6

Although we liberally construe pro se briefs, a pro se litigant is held to the same standards as a licensed attorney and must comply with applicable laws and rules of procedure. *See Wheeler v. Green*, 157 S.W.3d 439, 444 (Tex. 2005) (stating that "pro se litigants are not exempt from the rules of procedure"); *Mansfield State Bank v. Cohn*, 573 S.W.2d 181, 184–85 (Tex. 1978) ("There cannot be two sets of procedural rules, one for litigants with counsel and the other for litigants representing themselves. Litigants who represent themselves must comply with the applicable procedural rules, or else they would be given an unfair advantage over litigants represented by counsel."); *In re P.S.*, 505 S.W.3d 106, 111 (Tex. App.—Fort Worth 2016, no pet.) (same). We have "no duty—or even the right—to perform an independent review of the record and the applicable law to determine whether there was error; we cannot make the party's arguments for [hi]m, and then adjudicate the case based on the arguments we have made on [his] behalf." *Wellness & Aesthetics Inst., PA v. JB&B Cap., LLC*, No. 02-22-00330-CV, 2023 WL 4780511, at *2 (Tex. App.—Fort Worth July 27, 2023, pet. denied) (mem. op.) (quoting *Craaybeek v. Craaybeek*, No. 02-20-00080-CV, 2021 WL 1803652, at *5 (Tex. App.—Fort Worth May 6, 2021, pet. denied) (mem. op.)); *see also In re M.G.*, No. 02-23-00074-CV, 2023 WL 4008687, at *4 (Tex. App.—Fort Worth June 15, 2023, pet. denied) (mem. op.).

In his brief, Father asserts conclusory complaints unsupported by any citation to the record or to authorities and lacking a clear, cohesive argument or substantive analysis. Father also fails to explain how, if at all, these complaints were brought to the

7

trial court's attention. *See* Tex. R. App. P. 33.1(a)(1). Under different circumstances, we would dismiss Father's appeal for failure to comply with the briefing rules. *See* Tex. R. App. P. 38.9. But because parental termination is severe and permanent, we will review his issues. *See In re J.E.D.*, No. 11-19-00166-CV, 2019 WL 5617645, at *1 (Tex. App.—Eastland Oct. 24, 2019, no pet.) (mem. op.) (liberally construing and addressing issues raised in terminated parent's noncompliant brief); *Williams v. Tex. Dep't of Protective & Regul. Servs.,* No. 14-98-00700-CV, 2000 WL 4939, at *1 n.1 (Tex. App.—Houston [14th Dist.] Jan. 6, 2000, no pet.) (same).

Construing Father's pro se brief liberally, we discern that Father complains in his first issue that the trial judge should have recused herself for purportedly conducting ex parte conferences at the adversary hearing and one permanency hearing. But Father did not file a motion to recuse. Nor did he file a record of these hearings—it appears that no record was made—or cite evidence that he objected to the trial court's conduct at these hearings. Thus, Father has failed to preserve this issue for appeal. *See* Tex. R. App. P. 33.1(a); *Johnson v. Sepulveda*, 178 S.W.3d 117, 118 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (holding that failure to strictly follow recusal procedures in Rule 18a of the Texas Rules of Civil Procedure resulted in waiver of issue on appeal); *Galvan v. Downey*, 933 S.W.2d 316, 321 (Tex. App.—Houston [14th Dist.] 1996, writ denied) (holding that the error was not preserved when there was no record of a motion to recuse). In his second and third issues, Father contends that the evidence was insufficient to support the trial court's findings under Subsections (O) and (E) because

8

he completed all "court[-]ordered" services and never possessed Holly or played any role in her in vitro drug exposure. His fourth issue contests the trial court's best-interest finding.

Because our analysis of Mother's issues and Father's remaining issues overlaps, we will address the issues together.

## A. Standard of Review

For a trial court to terminate a parent–child relationship, the party seeking termination must prove two elements by clear and convincing evidence: (1) that the parent's actions satisfy one ground listed in Family Code Section 161.001(b)(1); and (2) that termination is in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *In re Z.N.*, 602 S.W.3d 541, 545 (Tex. 2020). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *Z.N.*, 602 S.W.3d at 545.

Thus, when reviewing the sufficiency of the evidence to support a termination finding, we ask whether a reasonable factfinder could have formed a firm belief or conviction that the finding was true. *Z.N.*, 602 S.W.3d at 545. Both legal and factual sufficiency turn on this question; the distinction between the two sufficiency analyses "lies in the extent to which disputed evidence contrary to a finding may be considered" in answering the question. *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018).

In our legal sufficiency analysis, we "look at all the evidence in the light most favorable to the finding," assuming that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could have done so and disregarding all evidence that a reasonable factfinder could have disbelieved. *Z.N.*, 602 S.W.3d at 545; *A.C.*, 560 S.W.3d at 630–31. Factual sufficiency, however, requires "weighing disputed evidence contrary to the finding against all the evidence favoring the finding" to determine if, "in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *A.C.*, 560 S.W.3d at 630–31; *see In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009) ("When the factual sufficiency of the evidence is challenged, only then is disputed or conflicting evidence under review."). The factfinder is the sole judge of the witnesses' credibility and demeanor. *J.O.A.*, 283 S.W.3d at 346.

Legal and factual sufficiency determinations overlap because factually sufficient evidence is necessarily legally sufficient. *In re A.O.*, No. 02-21-00376-CV, 2022 WL 1257384, at *8 (Tex. App.—Fort Worth Apr. 28, 2022, pet. denied) (mem. op.). Therefore, and because the Parents challenge both factual and legal sufficiency, we will conduct a consolidated review. *See id.* (doing same).

Generally, "[t]o affirm a termination judgment on appeal, a court need uphold only one termination ground," plus the best-interest finding. *In re N.G.*, 577 S.W.3d 230, 232–33 (Tex. 2019). Subsection (M), however, allows a trial court to terminate

10

parental rights when the parent's relationship with another child was terminated based on a finding under Subsection (D) or (E). Tex. Fam. Code Ann. § 161.001(b)(1)(M). Thus, when a parent challenges a Subsection (D) or (E) finding, due process and due course of law demand that we address the finding and detail our analysis. *N.G.*, 577 S.W.3d at 235, 237. Accordingly, we must address the trial court's Subsections (D) and (E) findings, even though they may not be dispositive. *See In re C.W.*, No. 02-21-00252-CV, 2022 WL 123221, at *3 n.5 (Tex. App.—Fort Worth Jan. 13, 2022, no pet.) (mem. op.); *In re J.B.*, No. 02-21-00239-CV, 2021 WL 6144074, at *20 (Tex. App.—Fort Worth Dec. 30, 2021, pet. denied) (mem. op.).

## B. Endangerment

In her first and second issues, Mother asserts that the evidence is legally and factually insufficient to support termination under Subsection (D). She asserts in her third and fourth issues that the evidence is legally and factually insufficient to support termination under Subsection (E). Father makes the same assertion in his third issue. In her seventh and eighth issues, Mother asserts that the evidence is legally and factually insufficient to support termination under Subsection (P). Neither Parent explains how the evidence is insufficient to support any of these grounds.

### 1. Applicable Law

Subsection (D) requires a finding that the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings [that] endanger[ed] the [child's] physical or emotional well-being." Tex. Fam. Code Ann. § 161.001(b)(1)(D).

11

Subsection (E) requires a finding that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct [that] endanger[ed] the [child's] physical or emotional well-being." *Id.* § 161.001(b)(1)(E). Similarly, Subsection (P) requires a finding that the parent "used a controlled substance . . . in a manner that endangered the health or safety of the child" and "failed to complete a court-ordered substance abuse treatment program" or "complet[ed] a court-ordered substance abuse treatment program [but] continued to abuse a controlled substance." *Id.* § 161.001(b)(1)(P).

To "'endanger' means to expose to loss or injury; to jeopardize." *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re A.N.*, No. 02-22-00036-CV, 2022 WL 2071966, at *3 (Tex. App.—Fort Worth June 9, 2022, pet. denied) (mem. op.). To terminate a parent's rights for endangerment under Subsections (D), (E), or (P), the parent's conduct need not be directed at the child, nor must the child actually suffer injury; rather, the specific danger to the child's well-being may be inferred from parental misconduct standing alone. *In re R.R.A.*, No. 22-0978, 2024 WL 1221674, at *6 (Tex. Mar. 22, 2024) (addressing Subsection (P)); *In re M.R.*, No. 02-19-00212-CV, 2019 WL 6606167, at *7 (Tex. App.—Fort Worth Dec. 5, 2019, no pet.) (mem. op.) (citing *In re M.N.G.*, 147 S.W.3d 521, 536 (Tex. App.—Fort Worth 2004, pet. denied), and addressing Subsections (D) and (E)).

"Conduct-based endangerment under Subsection (E) requires more than a 'single act or omission'; it requires a 'voluntary, deliberate, and conscious course of

12

conduct.'" *A.N.*, 2022 WL 2071966, at *3 (quoting *J.B.*, 2021 WL 6144074, at *21). This may include "actions before the child's birth, actions while the child is not in the parent's presence, and actions while the child is in the Department's custody." *Id.* at *3 (quoting *In re C.Y.*, No. 02-21-00261-CV, 2022 WL 500028, at *2 (Tex. App.—Fort Worth Feb. 18, 2022, no pet.) (mem. op.)). Although illegal drug use alone may not suffice to show endangerment under Subsection (P), "a pattern of drug use accompanied by circumstances that indicate related dangers to the child can establish a substantial *risk* of harm." *R.R.A.*, 2024 WL 1221674, at *7.

"Drugs and their effect on a person's ability to parent may qualify as an endangering course of conduct." *In re A.K.*, No. 02-22-00154-CV, 2022 WL 4545571, at *5 (Tex. App.—Fort Worth Sept. 29, 2022, pet. denied) (mem. op.) (citing *In re M.M.*, No. 02-21-00185-CV, 2021 WL 5227177, at *5 (Tex. App.—Fort Worth Nov. 10, 2021, no pet.) (mem. op.)). Evidence of a parent's drug use can support the conclusion that the child's surroundings endanger her physical or emotional well-being under Subsection (D) and can qualify as a voluntary, deliberate, and conscious course of conduct endangering the child's well-being under Subsection (E). *In re A.C.*, No. 05-22-00341-CV, 2022 WL 4923519, at *6 (Tex. App.—Dallas Oct. 4, 2022, no pet.) (mem. op.) (citing *In re C.V. L.*, 591 S.W.3d 734, 751 (Tex. App.—Dallas 2019, pet. denied)); *see also M.M.*, 2021 WL 5227177, at *5 (citing *Walker v. Tex. Dep't of Fam. & Protective Servs.*, 312 S.W.3d 608, 617–18 (Tex. App.—Houston [1st Dist.] 2009, pet. denied)). A parent's decision to use illegal drugs during the pendency of a termination suit, when

the parent's parental rights are in jeopardy, demonstrates a voluntary, deliberate, and conscious course of conduct that endangers a child's well-being. *A.K.*, 2022 WL 4545571, at *5; *In re M.E.-M.N.*, 342 S.W.3d 254, 263 (Tex. App.—Fort Worth 2011, pet. denied). When evaluating whether a parent's illegal drug use endangers a child under Subsection (P), we do not "evaluate drug-use evidence in isolation," but we "consider additional evidence that a factfinder could reasonably credit that demonstrates that illegal drug use presents a risk to the parent's 'ability to parent.'" *R.R.A.*, 2024 WL 1221674, at *7 (quoting *J.O.A.*, 283 S.W.3d at 345).

### 2. Analysis

The record reflects that the Parents habitually used methamphetamine and did not stop after the Department filed this suit. Specifically, Holly tested positive for methamphetamine and amphetamine at birth, and Father testified that Mother was using drugs while she was pregnant with Holly. Although he later contradicted his testimony, the trial court was the sole judge of Father's credibility and the weight given to his testimony. *See J.O.A.*, 283 S.W.3d at 346. Mother's drug use was also an issue in the termination case concerning Amy, and Mother was pregnant with Holly during that proceeding. Mother's parental rights were not terminated in that case only because Amy was placed with Mother's mother.

Father admitted at trial that he had tested positive for methamphetamine and marijuana use. He further admitted that he had been using methamphetamine since he was nineteen and that he had been using marijuana "for a long time." CASA volunteer

14

Piper Porter testified that she had observed the Parents with "very glossy eyes [and] slurred speech, [and] . . . smell[ing] of marijuana during visits [with Holly]" Father also admitted that he had used methamphetamine with Mother, specifically doing so in August 2023, when he failed a drug test.

The record also reflects that each Parent was ordered to take at least sixteen drug tests. Despite having received notice of each test, they failed to take or pass almost all of them. Family service plan evaluations admitted at trial also indicated that Father openly "refused to take drug tests[,] except [at] a place that has a history of taking bribes for clean tests." Father admitted at trial that he had "only taken two drug tests" while this case has been pending. Department caseworker Crystal Celerier testified that Mother had taken "some" drug tests. She also spoke with Mother about her failed drug tests and testified that Mother was not surprised that she had failed the tests. "[A] factfinder may reasonably infer that a parent's failure to comply with drug-test requirements indicates drug use." *In re D.A.*, No. 02-22-00260-CV, 2022 WL 17841133, at *7 (Tex. App.—Fort Worth Dec. 22, 2022, pet. denied) (mem. op.) (citing *In re W.E.C.*, 110 S.W.3d 231, 239 (Tex. App.—Fort Worth 2003, no pet.)).

The record further reflects that neither Parent participated in court-ordered substance-abuse programs. And according to Celerier, the Parents' continued drug use endangered Holly.

Indeed, methamphetamine addiction can wreak havoc not only on the addict but on the addict's family, and young children, such as Holly, are particularly vulnerable.

15

*See M.M.*, 2021 WL 5227177, at *6. "The danger here is more than 'metaphysical,' and more is at stake than a less-than-ideal family environment." *Id.*; *see Boyd*, 727 S.W.2d at 533 ("'[E]ndanger' means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, [but] it is not necessary that the conduct be directed at the child or that the child actually suffers injury."). The record reflects not only evidence of the Parents' habitual, unrelenting methamphetamine use but their refusal to acknowledge and address their addiction, even when faced with the prospect of losing their daughter. This is sufficient to demonstrate their voluntary, deliberate, and conscious course of conduct that endangered Holly's well-being. *See A.K.*, 2022 WL 4545571, at *5.

The record also reflects that the Parents refused to acknowledge, much less address, Holly's special needs. The record reflects that Holly required a special feeding protocol to prevent her from aspirating while eating. This became an issue when the Parents failed to properly feed Holly during supervised visits. Celerier testified that when she spoke with them about this, they "adamantly denied that there was anything wrong with [Holly]," denied that "she needed to be fed that [special] way," and asserted that "they knew how to feed her and . . . could take care of her." Celerier cited this as an additional reason that Holly should not be returned to the Parents.

Father did not refute Celerier's testimony but merely offered that his mother worked for a hospital, thus he would "have access to get [Holly's special needs] taken care of." He further asserted that Mother had demonstrated the ability to care for a

16

special-needs child by addressing Amy's "G-button." But he later admitted that Mother was only allowed supervised visitation of Amy and had never taken care of her alone. Evidence that the Parents denied and even refused to address Holly's special needs further supports the trial court's endangerment findings.

The Parents also failed to provide proof of employment and stable, appropriate housing. Specifically, Baker testified that she found no preparations for Holly's care when she visited Father's home. She was also told that Father, who lives with his mother and brother, had planned to sleep on the couch while using his mother's office or a small room for Holly. Celerier testified that she did not assess Father's home because his "hostility . . . towards caseworkers" prevented her from visiting his home. Porter echoed Celerier's concern when concluding that Father's home was not appropriate for Holly. Father rebutted these assertions, contending that his home was safe and equipped to care for Holly. The trial court was able to weigh this testimony. *See J.O.A.*, 283 S.W.3d at 346. Mother's whereabouts were unknown at the time of trial because she had failed to provide the Department with her address. Thus, the Department was unable to evaluate her housing.

On this record, we conclude that the evidence is legally and factually sufficient to support the trial court's findings under Subsections (D), (E), and (P). Accordingly, we overrule Mother's first, second, third, fourth, seventh, and eighth issues, and Father's third issue.

17

## C. Failure to Complete Service Plan

In Mother's fifth and sixth issues and in Father's second issue, the Parents assert that the evidence is insufficient to support the trial court's finding that they failed to complete their family service plans.  *See* Tex. Fam. Code Ann. § 161.001(b)(1)(O) (permitting parental termination for failing "to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department").  Both Parents assert that they completed all court-ordered services.  In so arguing, they rely on the family service plans' "Court Ordered" designations.  Mother asserts that she was not required to complete any of her family service plan because it "never had a box checked that would have shown [her] each category of services [that were] court-ordered."  Father asserts that only the "psych[iatric] evaluation and home evaluation" were court-ordered and that he completed these services.

Although the record reflects that the family service plans incorrectly indicated "Court Ordered:  No" on all but Father's parenting-skills requirement, the family service plans were expressly incorporated into the trial court's orders. The trial court first addressed the Department's family service plans in its temporary orders.  The temporary orders expressly required the Parents (1) to submit to "court-ordered" psychological evaluations; (2) to attend counseling "upon referral by the Department caseworker"; (3) to comply with the Department's family service plans; (4) to submit to

18

"court-ordered" drug- and alcohol-dependency assessments; and (5) to submit specimens, "as directed by the Department and at times to be determined by the Department, for analysis by a drug testing laboratory." Father was separately ordered to "attend, participate in[,] and successfully complete parenting classes . . . ." Thus, on their face, the temporary orders required the Parents to comply with Department-ordered services, save the two services yet to be "court-ordered."

The Department issued the family service plans seven days later and attempted to review them with the Parents. But the Parents did not comply. Celerier testified that she met with Mother and gave her a copy of the family service plan but could not complete the service-plan review because Mother "didn't want to finish the conversation." Celerier repeatedly told Mother that it was important to complete the service plan. Father testified at trial that he was aware of the family service plan but was not aware that it was a court order because "[t]he packets that [he] was given said[']no.[']"

Regardless, the trial court held a status hearing two weeks after issuing temporary orders and signed an order requiring the Parents to comply with the family service plans. The status-hearing order also expressly required service-plan compliance to reduce supervision of the Parent's visitations and notified the Parents that their service-plan progress would be reviewed at subsequent hearings. Although the Parents did not attend this hearing, the Department notified the Parents of the services it had set up for them.

19

Father appeared at the first permanency hearing on May 4, 2023, and both Parents appeared at the second permanency hearing on June 15, 2023. True to its status-hearing order, the trial court's permanency-hearing orders reflect that the trial court reviewed the Parents' service-plan progress and found them wanting. These orders also incorporated the Department's family service plans as orders of the court. Thus, even if the Parents were at one time confused by the erroneous family service plans, any such confusion was resolved for Father by May 4, 2023, and for Mother by June 15, 2023.

Yet, as reflected in the trial court's October 12, 2023 permanency-hearing order, the Parents still failed to comply with the family service plans. Celerier testified at trial that Father had only participated in supervised visitations and his psychological evaluation[2] and that Mother "did not follow through with any services completely." She further testified that neither Parent completed any service, which included following service recommendations.

Accordingly, we hold that the evidence is legally and factually sufficient to support the trial court's finding that the Parents failed to comply with the Department's

---

[2]Notably, the psychological evaluation was designated "Court Ordered: No" on Father's family service plan, yet Father completed this requirement. Parenting-skills, however, was designated "Court Ordered: Yes," but he failed to complete this requirement.

family service plans. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(O). We overrule Mother's fifth and sixth issues and Father's second issue.

## D. Best Interest

In his fourth issue, Father contends that the evidence is insufficient to support the best-interest finding because the trial court did not find that he was an unfit parent. Mother does not contest the trial court's best-interest finding.

Although we generally presume that keeping a child with a parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the best-interest analysis is child-centered, focusing on the child's well-being, safety, and development, *A.C.*, 560 S.W.3d at 631. In determining whether evidence is sufficient to support a best-interest finding, we review the entire record. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). Evidence probative of a child's best interest may be the same evidence that is probative of a Subsection (b)(1) ground. *Id.* at 249; *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002); *see* Tex. Fam. Code Ann. § 161.001(b)(1), (2). We also consider the evidence in light of nonexclusive factors that the factfinder may apply in determining the child's best interest:

    (A)    the child's desires;

    (B)    the child's emotional and physical needs now and in the future;

    (C)    the emotional and physical danger to the child now and in the future;

    (D)    the parental abilities of the individuals seeking custody;

(E)     the programs available to assist these individuals to promote the child's best interest;

(F)     the plans for the child by these individuals or by the agency seeking custody;

(G)     the stability of the home or proposed placement;

(H)     the parent's acts or omissions indicating that the existing parent–child relationship is not a proper one; and

(I)     any excuse for the parent's acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors"). These factors are not exhaustive, and some may not apply to particular cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient to support a finding that termination is in the child's best interest. *Id.* On the other hand, "paltry evidence relevant to each" factor will not support such a finding in cases involving more complex facts. *Id.*

The record reflects evidence supporting the trial court's best-interest finding under every *Holley* factor except one: the child's desires. This is only because Holly is too young to voice a desire. *See A.K.*, 2022 WL 4545571, at *3; *In re M.H.*, 319 S.W.3d 137, 150 (Tex. App.—Waco 2010, no pet.); *cf.* Tex. Fam. Code Ann. § 153.134(a)(6) (a child must be at least twelve years old before the child's preference, if any, regarding the person to have the exclusive right to designate the child's primary residence becomes a factor), § 156.101(a)(2) (same).

22

### 1. Holly's Emotional and Physical Needs Now and in The Future

The record reflects that Holly had to be fed "on her side and [at a] pace so that she will not aspirate." As previously noted, the Parents denied and refused to address this need. Holly's foster mother also testified at trial that Holly had been "hospitalized for RSV[3] because of congestion that she was having a hard time kicking" and needed surgery to investigate her "swallowing issue," "remove her adenoids, place tubes in her ears to help with drainage, and do a full airway assessment." The record also reflects that Holly was receiving treatment to address delays in "fine motor skills" and walking. Holly's foster parents were addressing Holly's special needs.

Although Father testified that Mother had cared for Amy's special needs, he admitted on cross-examination that she was never alone with Amy. Father offered only that he had access to medical resources because his mother worked for a hospital. No other evidence was offered to demonstrate that the Parents were willing and able to address Holly's special needs. This factor weighs in favor of the trial court's best-interest finding.

---

[3]RSV means "respiratory syncytial virus." *See In re S.R.*, No. 02-11-00153-CV, 2012 WL 4465153, at *1 (Tex. App.—Fort Worth Sept. 27, 2012, no pet.) (mem. op. on reh'g).

### 2. Emotional and Physical Danger to Holly Now and in the Future and Programs Available to Assist the Parents

The Parents' drug use while this suit has been pending indicates that they will likely continue using drugs. This fact alone could constitute a danger to Holly. *See M.M.*, 2021 WL 5227177, at *6. Moreover, neither Parent made any effort to address their drug addiction, despite having access to services. Indeed, neither Parent started, much less completed, any service except visitation and Father's psychological assessment. Instead, they chose to argue that the services were not court-ordered. Thus, the trial court could have concluded that even if programs were made available to the Parents, the Parents would not have benefitted from them. *See In re N.K.*, 399 S.W.3d 322, 334 (Tex. App.—Amarillo 2013, no pet.). These factors weigh in favor of the trial court's best-interest finding.

### 3. The Parents' Parental Abilities

Although the Parents completed some of their supervised visitations, the record reflects that they failed to exhibit appropriate behavior during some visits. Specifically, Porter testified that she witnessed Father "whistling, like as if to call a dog, to get [Holly's] attention" during visitations and that during a September 2023 visit, Father "threw a book on the floor to, like, make a loud noise to get [Holly's] attention when she was just wanting to play." Father denied the whistling allegation, and the trial court was able to weigh this testimony. *See J.O.A.*, 283 S.W.3d at 346. Porter also observed that both Parents had "very glossy eyes [and] slurred speech, and . . . smell[ed] of

24

marijuana" when they visited Holly in November 2023, one month before trial. She also observed that Holly generally avoided the Parents when they would visit and did not "necessarily want to be in the vicinity with them."

Father failed to start, much less complete, parenting classes—which were designated "Court Ordered: Yes" on his service plan. Instead, he chose to argue that they were not court-ordered. This weighs against Father on the trial court's best-interest finding.

In contrast, the record reflects that Mother completed parenting classes during her prior termination proceeding and exhibited "a good amount of knowledge about parenting." Celerier testified that Mother attended most of her scheduled visits and behaved appropriately most of the time. Father also testified that Mother was willing and able to care for Holly, but he failed to cite any evidence supporting this contention. Had Mother contested the trial court's best-interest finding, evidence that Mother had developed parenting skills but failed to consistently exhibit them during visits would render this factor neutral for Mother on the trial court's best-interest finding.

### 4. The Plans for Holly by the Individuals Seeking Custody

The Department attempted to place Holly with Mother's parents, who also had possession of Amy, but they declined to take Holly. Father asked the Department to consider his mother for Holly's placement. The Department made multiple attempts to contact her, but she never responded. No other relatives were identified as possible placements.

Holly's foster mother testified that her other children treated Holly like a sister and that she wanted "to love [Holly] for the rest of her life, give her stability [and] peace, [and] teach her about Jesus." She had adopted her other children and planned to adopt Holly. When asked about his plans for Holly, Father offered only that he wanted her returned and "then we would just like to continue on like any normal family." The Parents offered no other evidence of their plans for Holly. This factor weighs in favor of the trial court's best-interest finding.

### 5. The Stability of the Parents' Homes or the Proposed Placement

"[C]hildren need permanency and stability." *In re G.V., III*, 543 S.W.3d 342, 350 (Tex. App.—Fort Worth 2017, pet. denied). "A child's need for permanence through the establishment of a stable, permanent home is a paramount consideration in the best-interest determination." *M.M.*, 2021 WL 5227177, at *8 (citing *In re E.R.W.*, 528 S.W.3d 251, 267 (Tex. App.—Houston [14th Dist.] 2017, no pet.)). The record does not reflect that either Parent had a stable home for Holly. Father lives with his mother and brother and was unprepared to care for Holly. And Father's "hostility . . . towards caseworkers" prevented any further evaluation of his home. Mother's whereabouts were unknown at the time of trial because she had failed to provide the Department with her address. Thus, the Department was unable to evaluate her housing. And neither Parent provided proof of employment. This factor weighs in favor of the trial court's best-interest finding.

### 6. The Parents' Acts or Omissions Indicating that the Existing Parent–Child Relationship is Not a Proper One and Any Excuse for the Parents' Acts or Omissions

The Parents' methamphetamine addictions are well-documented in the record. They either failed or failed to submit to almost every drug test scheduled during this case and refused to participate in substance-abuse treatment and counseling. Father also refused to participate in parenting classes. Despite being ordered to pay child support starting in March 2023, Mother failed to pay child support until October 2023, and Father did not pay at all. The only excuses offered at trial for these acts or omissions were ignorance and lack of a court order. But, as previously discussed, the trial court ordered the services at issue. The Parents were also notified of the services and the importance of working their family service plans and given the opportunity to do so. Yet they failed to make even a minimal effort to do so. This factor weighs in favor of the trial court's best-interest finding.

Stability and permanence are paramount in a child's upbringing. *In re Z.C.*, 280 S.W.3d 470, 476 (Tex. App.—Fort Worth 2009, pet. denied) (per curiam). The Parents cannot provide either. The record reflects that they openly refused to acknowledge, much less address, their methamphetamine addictions. They further failed to offer proof of stable employment and appropriate housing. Indeed, they failed to pay all but two months of child support. Moreover, they openly rejected almost all of the services offered to help them address their issues despite the looming prospect of losing their parental rights. In contrast, Holly's foster parents are willing and able to

27

provide Holly with a stable home and address her special needs. Accordingly, we hold that the evidence is legally and factually sufficient to support the trial court's best-interest finding as to Father. *See A.C.*, 560 S.W.3d at 631.

## IV. CONCLUSION

Having overruled all of the Parents' issues and having determined that the evidence is sufficient to support the trial court's best-interest finding, we affirm the trial court's judgment.

/s/ Dana Womack

Dana Womack
Justice

Delivered: April 11, 2024